**UNITED STATES of America, Appellee,**

v.

**James Ervin LEROUX, Appellant.**

**No. 83–2299.**

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1984.

Decided July 11, 1984.

Rehearing and Rehearing En Banc Denied Aug. 8, 1984.

London, Greenberg & Pleban, Norman S. London, Lee T. Lawless, Lawrence J. Fleming, St. Louis, Mo., for appellant.

Thomas E. Dittmeier, U.S. Atty., Charles A. Shaw, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before ROSS, Circuit Judge, HENLEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

HENLEY, Senior Circuit Judge.

James Ervin Leroux appeals from his conviction for mail fraud under 18 U.S.C. § 1341 on account of his role in a scheme to defraud an insurance company. He urges reversal contending that: (1) he was entrapped as a matter of law; (2) the government's participation and conduct was so outrageous and fundamentally unfair that he was deprived of due process; (3) the statements of a codefendant were improperly admitted; and (4) the evidence is insufficient to sustain the jury verdict. We affirm the judgment of the district court.[1]

---

1. The Honorable William L. Hungate, United States District Judge, Eastern District of Missouri.

## BACKGROUND

From July, 1980 until March, 1982 the Federal Bureau of Investigation engaged in an undercover "sting" operation in Southeast Missouri targeted primarily at automobile · theft. Special Agent Roy Christopher headed the operation in which stolen automobiles were purchased through a fictitious company known as LeBlanc Auto Sales.

During the course of the undercover operation, Agent Christopher had frequent contact with Willard Kenneth O'Dell, Leroux's codefendant.[2] Agent Christopher purchased several stolen vehicles from O'Dell and provided O'Dell with license plates and safety inspection stickers as payment for the automobiles. The meetings and telephone conversations between the two were recorded by Christopher and seven of these tapes were played for the jury.[3]

On December 5, 1980 Christopher and O'Dell met at O'Dell's residence. Christopher noticed a Caterpillar Traxcavator equipped with bulldozer parked in the yard and asked O'Dell if he owned it. O'Dell responded that he did not, but that it was for sale and that the owner would take $1500.00 for it. Christopher indicated that he might be interested in purchasing it. The two discussed the fact that it might need some repairs and then went on to discuss other possible purchases.

The next meeting where the subject of the Caterpillar arose took place on December 8, 1980. O'Dell advised Christopher that the Caterpillar had "blown a rod" while he was using it and reduced the price to $500.00. Christopher asked if the price included other equipment and O'Dell responded that it did not since the owner only had insurance on the Caterpillar. O'Dell

stated that the owner was a "local boy" who would give Christopher a week and a half before reporting it as stolen.[4]

The next morning Christopher called O'Dell and asked if he would have to provide the transportation to remove the Caterpillar. O'Dell responded affirmatively, and again assured Christopher of the availability and terms of the sale and stated that he would call the owner to confirm the arrangements.

On December 11, 1980 Christopher called O'Dell who stated that the Caterpillar would not be ready until the following Tuesday or Wednesday. Later that day O'Dell called Christopher and related that he had spoken to the owner and that the deal could not go through until Wednesday or Thursday since the owner needed to use the machine to dig up some road tiles. O'Dell stated that the owner would not report it as stolen for a week or so and that the owner would help load it. Finally, O'Dell agreed to take ten federal car safety stickers in exchange for the equipment.

The next day, December 12, Christopher gave O'Dell the ten stickers. The two discussed the Caterpillar's mechanical problems and further discussed when they would load the equipment. On December 17 the two confirmed that Christopher would pick up the Caterpillar the next day.

As planned, Christopher met O'Dell at his residence on December 18. Leroux and Leroux's employee, Chester Griffin, were also present, and the four subsequently loaded the Caterpillar onto Christopher's trailer. Leroux told Christopher that he would not report the Caterpillar stolen until December 29, 1980, and that "it would be like he would be coming back from the Christmas vacation and find his equipment

---

2. O'Dell pleaded guilty prior to trial of Leroux.

3. Agent Christopher recorded 68 telephone conversations and 24 separate meetings, all dealing with the subject of stolen vehicles. Leroux was not present at any of these meetings. In addition to the tapes, Christopher testified as to the substance of the conversations.

4. This type of scheme is known as an "insurance job." An insurance job occurs when the owner of a car or piece of equipment sells or gives the equipment to an individual and then reports the equipment stolen at a later date. The owner then collects the insurance proceeds and the individual to whom the equipment is given sells it for cash. *United States v. O'Dell*, 713 F.2d 421, 422 (8th Cir.1983).

stolen." Christopher departed with the Caterpillar and followed O'Dell, Leroux and Griffin in a detour around town to avoid being seen and then proceeded toward the Arkansas border. After a few miles, they stopped and Leroux gave Christopher directions. Christopher asked Leroux who he should say was the owner in case he got stopped and Leroux replied, "Tell them it was Shorty Leroux." Leroux also told him to say that Christopher had permission to use the bulldozer.[5] Chester Griffin testified that he had worked for Leroux for approximately twenty years and that Leroux is commonly called "Shorty" or "Short." Griffin confirmed that he, Leroux, O'Dell and a truck driver loaded the equipment in December of 1980.

Leroux reported the bulldozer stolen to the county sheriff on January 2, 1981. Further, Leroux reported the "theft" to his insurer which set in motion the four separate mailings concerning his claim. The trial jury rejected the defense of entrapment and convicted him of four counts of mail fraud on the basis of his participation in the insurance fraud. He was sentenced to six months imprisonment on one of the counts and received suspended sentences with a total of five years probation on the remaining counts. Restitution in the amount of $5,975.00 was made a condition of probation.

## THE ENTRAPMENT AND DUE PROCESS CLAIMS.

Leroux contends that the evidence established entrapment as a matter of law. He asserts that any dealings over the Caterpillar originated with the government agent, that Agent Christopher pursued the matter in repeated telephone calls and meetings, and that Christopher provided the means of removing the equipment.

■ In order to demonstrate entrapment as a matter of law,

the evidence must clearly have indicated that a government agent originated the criminal design; that the agent implant-

ed in the mind of an innocent person the disposition to commit the offense; and that the defendant then committed the criminal act at the urging of the government agent.

*United States v. Shaw,* 570 F.2d 770, 772 (8th Cir.1978); *United States v. Lard,* 734 F.2d 1290 at 1293–1294 (8th Cir.1984). In determining this issue, we must view the evidence in the light most favorable to the government. *United States v. French,* 683 F.2d 1189, 1192 (8th Cir.), *cert. denied,* 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982). Where there is conflicting evidence, "[t]he question of entrapment is ordinarily for the jury." *Holmes v. United States,* 709 F.2d 19, 20 (8th Cir.1983); *Shaw,* 570 F.2d at 772.

■ Contrary to Leroux's contentions, we seriously doubt whether the issue of entrapment should even have been submitted to the jury in this case. The clear majority rule in the federal courts is that the entrapment defense does not extend to inducement by a private citizen. *See United States v. Beverly,* 723 F.2d 11, 12 (3d Cir.1983); *United States v. Lee,* 694 F.2d 649, 654 (11th Cir.), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983); *United States v. Mers,* 701 F.2d 1321, 1340 (11th Cir.) (rejects vicarious entrapment theory), *cert. denied,* — U.S. —, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983); *United States v. Shapiro,* 669 F.2d 593, 597–98 (9th Cir.1982) (refuses to recognize concept of derivative entrapment); *United States v. Dove,* 629 F.2d 325, 329 (4th Cir.1980) (only inducement by government agent gives rise to entrapment defense); *United States v. Twigg,* 588 F.2d 373, 376 (3d Cir. 1978) (to the same effect); *United States v. Burkley,* 591 F.2d 903, 911 n. 15 (D.C.Cir. 1978) (same), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979); *United States v. Garcia,* 546 F.2d 613, 615 (5th Cir.) (same), *cert. denied,* 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977); *Whiting v. United States,* 321 F.2d 72, 76 (1st Cir.)

---

5. These conversations were not recorded since Christopher's tape recorder malfunctioned that day.

(same), *cert. denied,* 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963); *Beard v. United States,* 59 F.2d 940, 941 (8th Cir.1932) (same); *see generally* Park, *The Entrapment Controversy,* 60 Minn.L.Rev. 163, 240 (1976). *Cf. United States v. Valencia,* 645 F.2d 1158, 1168 (2d Cir.1980) (indirect inducement may amount to entrapment). Here, any inducement which may have come from Christopher went to O'Dell, not Leroux. In fact, Christopher did not have any contact with Leroux until the day that they loaded the Caterpillar, well after the scheme had been conceived. Any alleged inducement to Leroux came only from O'Dell,[6] and since O'Dell was clearly not a government agent, the entrapment defense is unavailable to Leroux as a matter of law.

■ Moreover, assuming *arguendo* that Leroux could avail himself of any entrapment of O'Dell, we do not believe Leroux has shown that he or O'Dell were induced to enter the scheme by the government. When the subject of the Caterpillar first came up on December 5, Christopher merely asked O'Dell if he owned the equipment. O'Dell's immediate response was that the owner (Leroux) wanted to sell the equipment. Thus, it was O'Dell, not Agent Christopher, who offered the equipment for sale. While Christopher may have brought up the subject of the Caterpillar purchase several times thereafter, and while he may have provided the means for the removal of the equipment, this case clearly falls within the rule that there is no entrapment where a government agent merely affords the defendant the opportunity or facility to commit the crime.[7] *See, e.g., French,* 683 F.2d at 1193; *Kibby v. United States,* 372 F.2d 598, 602–03 (8th Cir.), *cert. denied,* 387 U.S. 931, 87 S.Ct. 2055, 18 L.Ed.2d 993 (1967); *United States v. Hill,* 626 F.2d 1301, 1303–06 (5th Cir.1980). In addition,

Leroux's actions at the December 18 meeting show that he unhesitatingly sought to complete the scheme's objectives without any persuasion by the government. In none of the conversations did Christopher suggest that the owner report the equipment stolen in order to fraudulently collect the insurance proceeds. Thus, it is clear that both O'Dell and Leroux were predisposed to enter the scheme and that Leroux was predisposed to make the fraudulent mailings. Christopher merely informed O'Dell, and through O'Dell, informed Leroux, that he was a willing buyer. This is not entrapment. *Kibby,* 372 F.2d at 602.

■ We reject as well Leroux's related contention that the level of government participation and involvement in the crime was such as to deprive him of due process. In order to prevail on this claim, Leroux must show that Agent Christopher's extent of involvement was so outrageous and shocking that it exceeded the bounds of fundamental fairness. *See, e.g., United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *United States v. McCaghren,* 666 F.2d 1227, 1230–31 (8th Cir.1981).

From what has been said, it is clear that although Agent Christopher's participation in the illegal enterprise was certainly substantial, it fell far short of being demonstrably outrageous. *Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring). Government agents "may go a long way in concert with the individual in question" without violating due process. *United States v. Quinn,* 543 F.2d 640, 648 (8th Cir.1976).

### O'DELL'S TAPED STATEMENTS.

O'Dell did not testify at trial. Instead the government introduced the taped con-

---

**6.** We note that there was little or no evidence which would indicate that O'Dell persuaded or cajoled Leroux into entering the scheme or making the fraudulent mailings.

**7.** In addition, the tape of December 5 indicates that Leroux and O'Dell had already communicated with each other about the scheme *before* O'Dell could relate to Leroux Christopher's in-

terest in the equipment. This is shown by the fact that, at the time of the December 5 meeting, O'Dell already knew that the Caterpillar was for sale and that it would be an "insurance job." Therefore, Leroux's entry into the scheme came prior to any indirect inducement that could have passed from O'Dell to Leroux.

versations between Christopher and O'Dell and seven of these tapes were played for the jury. At trial the government contended that the tapes were admissible due to the existence of a common scheme or plan between O'Dell and Leroux. The government concedes that, before the tapes could be properly admitted, the requirements of FRE 801(d)(2)(E) [8] must be met.

■ An out-of-court statement of a coconspirator is admissible against a defendant if

the government demonstrates (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy.

*United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir.1978); *United States v. Bentley*, 706 F.2d 1498, 1506 (8th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983). *See generally* Annot., 44 A.L.R. Fed. 627 (1979). Rule 801(d)(2)(E) and its requirements are applicable even where a conspiracy is not formally charged. *United States v. Snider*, 720 F.2d 985, 992 (8th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984); *United States v. Smith*, 596 F.2d 319, 321 (8th Cir.1979); *United States v. Scavo*, 593 F.2d 837, 845 n. 4 (8th Cir.1979). The government must submit sufficient independent evidence so that "the district court is satisfied that it is more likely than not that the statement was made during the course and in furtherance of an illegal association to which the declarant and the defendant were parties." *Bentley*, 706 F.2d at 1506 (quoting *Bell*, 573 F.2d at 1044).

■ To meet this burden, the government points to the evidence of the December 18, 1980 meeting. At this time, Leroux helped start the Caterpillar and load it onto Agent Christopher's trailer. Leroux told Christopher that he would not report the equipment stolen until December 29 and directed Christopher around town in order

to avoid having his equipment recognized. After traveling several miles, the group stopped and Leroux gave Christopher directions and told him to say that "Shorty Leroux" gave him permission to use the Caterpillar. Finally, the government showed that Leroux reported the Caterpillar stolen to both law enforcement authorities and his insurer. We agree with the government that this evidence was more than sufficient to establish that a common scheme to commit fraud existed and that Leroux and O'Dell were parties to the scheme.

Leroux does not appear to argue with this finding. However, he does contend that the taped statements were not made "during the course of and in furtherance of" any scheme to which Leroux was at that time a party. Specifically, he alleges that there is no independent evidence to show that Leroux had any involvement in the plan until the December 18 meeting. Therefore he maintains that none of the statements was made "during the course of" the O'Dell-Leroux scheme. In addition, he contends that the taped conversations contained many other statements about illegal transactions with which Leroux had nothing to do. He asserts that these portions of the tapes should have been excluded because they were not "in furtherance" of the O'Dell-Leroux plan.

■ We agree with Leroux that "a coconspirator's statements made before the inception of the conspiracy do not fall within the coconspirator exception to the hearsay rule ...." *United States v. Heater*, 689 F.2d 783, 787 (8th Cir.1982); *see also United States v. Coe*, 718 F.2d 830, 840 (7th Cir.1983); *United States v. Tombrello*, 666 F.2d 485, 490 (11th Cir.), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982); *United States v. Vaught*, 485 F.2d 320, 323 (4th Cir.1973). However, statements made by coconspirators before a defendant joins the conspiracy are admis-

---

8. Federal Rule of Evidence 801(d)(2)(E) states:
   A statement is not hearsay if * * * the statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

sible as long as the conspiracy or scheme existed at the time the statements were made. *Coe,* 718 F.2d at 839; *Heater,* 689 F.2d at 788; *Tombrello,* 666 F.2d at 491; *Anderson v. United States,* 532 F.2d 1218, 1230 (9th Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976). Here, while the independent evidence of the December 18 meeting does not indicate exactly when Leroux and O'Dell formed the unlawful scheme, Leroux's actions make it clear that the illegal plan existed prior to that date. All of the parties to that meeting proceeded under the assumption that the deal had already been struck. In this situation, with Leroux's participation in the enterprise clear, we do not believe Leroux should benefit from the government's failure to establish the specific time of the scheme's beginnings. "The statements were properly admissible as having been made in the course of the conspiracy because a course of action had already been established by independent evidence." *United States v. Green,* 600 F.2d 154, 157 (8th Cir.1979).

 Moreover, even assuming that the tapes were improperly admitted, we believe the error was harmless beyond a reasonable doubt. "[I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). The question to ask is, absent the error, "is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *Id.* 103 S.Ct. at 1981. Here, the independent evidence clearly established Leroux's participation in selling the equipment and in planning this "insurance job." The fraudulent report to his insurer that the Caterpillar had been stolen when he knew such was not the case completed the crime.[9] In view of the strong independent

evidence of guilt, we are convinced that the admission of the tapes had no appreciable adverse effect on the jury. *See generally United States v. Reed,* 724 F.2d 677, 679 (8th Cir.1984); *Bentley,* 706 F.2d at 1507; *Green,* 600 F.2d at 158; *United States v. Smith,* 578 F.2d 1227, 1233–34 (8th Cir. 1978).

What has already been said also answers Leroux's contention that those portions of the tapes which did not directly deal with the Caterpillar purchase were not "in furtherance" of the O'Dell-Leroux scheme. Even assuming the correctness of Leroux's position, we do not believe that the error requires reversal.

 As for the alleged failure of the district court to make required *Bell* findings, we note that, even though the court did not explicitly make the three *Bell* determinations on the record, he did conclude that the statements were admissible after hearing both sides' arguments concerning Rule 801(d)(2)(E)'s requirements. While we certainly do not wish to encourage any lack of full compliance with *Bell,* we have hesitated to hold that such a failure requires reversal. *E.g., Bentley,* 706 F.2d at 1507 n. 6; *United States v. Baykowski,* 615 F.2d 767, 771–72 (8th Cir.1980); *United States v. Littlefield,* 594 F.2d 682, 686 (8th Cir. 1979). *United States v. Macklin,* 573 F.2d 1046, 1048–49 (8th Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978). In light of our conclusion that any error in the admission of the tapes was clearly harmless, we hold that reversal is not required.[10]

The judgment of the district court is affirmed.

---

**9.** We reject Leroux's contention that the evidence was insufficient to support the verdict for these same reasons. Leroux's argument that Christopher's identification of him is unreliable patently is without merit.

**10.** We do not wish to imply that the failure to make explicit *Bell* determinations can never be grounds for reversal. Where a sufficient showing of prejudice is demonstrated from such error, reversal may be warranted.