**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Joseph D. HARRIS a/k/a Sonny Joe Harris (92–1455); Alton Kilbourn (92–1457), Defendants–Appellants.**

**Nos. 92–1455, 92–1457.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 23, 1993.

Decided Nov. 9, 1993.

---

Robert W. Donaldson and Kathleen Moro Nesi (argued and briefed), Asst. U.S. Attys., Janice V. Terbush, Detroit, MI, for plaintiff-appellee.

Anthony T. Chambers (argued and briefed), Detroit, MI, for Sonny Harris.

Sonny Joe Harris, pro se.

Douglas R. Mullkoff (argued and briefed), Ann Arbor, MI, for Alton Dennis Kilbourn.

Alton Dennis Kilbourn, pro se.

Before: KEITH, GUY, and BATCHELDER, Circuit Judges.

RALPH B. GUY, JR., Circuit Judge.

Defendants, Joseph Harris and Alton Kilbourn, appeal their convictions for their roles in the attempted purchase of cocaine from undercover federal agents. Defendants raise six issues on appeal: (1) whether the district court erred by failing to conclude that Harris was entrapped as a matter of law; (2) wheth-

er prejudicial error occurred when the district court responded to a note from the jury without notifying counsel; (3) whether the admission of a tape recorded conversation between Harris and a confidential informant was proper; (4) whether the court erred in denying Kilbourn's motion for severance; (5) whether the court abused its discretion in excluding Kilbourn's statement offering to take a polygraph test; and (6) whether the evidence was sufficient to support Kilbourn's conviction. We affirm.

## I.

The federal Drug Enforcement Administration (DEA) began an investigation of Joseph Harris in March of 1990 with the assistance of a confidential informant, Larry Awdish. Awdish, a former drug dealer, had been convicted of federal drug charges, and he agreed to cooperate with the government in exchange for consideration at sentencing. Awdish first met Harris in 1987, when Harris began purchasing cocaine from Awdish. Initially, Harris bought small amounts of cocaine from Awdish, but Harris subsequently began purchasing one-half kilogram amounts. This continued until Awdish's arrest in May 1987.

Awdish and Harris continued to keep in contact with each other. In 1989, Awdish spotted Harris at a local nightclub where Harris worked as a disc jockey, and Harris expressed interest in resuming purchases of cocaine from Awdish. According to Awdish, Harris was unable to finance a large purchase at that time. At trial, Harris claimed that the pair did not discuss cocaine at their September 1989 meeting, and that Harris did not see Awdish again until March of 1990. However, phone records would appear to corroborate Awdish's story, for a summary of telephone logs from the fall of 1989 revealed that Harris placed five telephone calls to Awdish in a four-day period in early October 1989.

In March of 1990, Awdish again saw Harris. They visited for a few minutes and exchanged phone numbers, but Awdish testified that the meeting with Harris did not result in a discussion of cocaine. Awdish did, however, report his chance encounter with Harris to his DEA case agent, and it was decided that Awdish should contact Harris to gauge his interest in purchasing cocaine. Awdish placed the call, but Harris responded that he was trying to "go straight with his life" and therefore rejected Awdish's offer. The conversation then turned to real estate, and Harris, who had become a real estate agent, set up an appointment to show Awdish a condominium for sale.

The next day, Harris phoned Awdish and told him that arrangements had been made for Awdish to view the condominium. In addition, according to Awdish, Harris told him that he might be interested in a cocaine deal. When they met, Awdish and Harris discussed cocaine quantity and prices and arranged for Awdish to meet Ronald Morgan, Harris' partner from Flint, Michigan,[1] at a local restaurant. Harris also told Awdish to quote Morgan a price $1,000 over the purchase price so that Harris could receive an extra $1,000. Harris, Morgan, and Awdish met at a Denny's restaurant in Southfield, Michigan, on March 22, 1990, to discuss the purchase of one to four kilograms of cocaine. The buy was to have occurred two days later, but the meeting did not occur. The parties then rescheduled for March 26 at the same Denny's location.

On that day, Awdish met with co-defendants Morgan and Kilbourn. Harris already had spoken with Awdish and explained that he would not be present at the meeting because he was busy at the real estate office. Once in the restaurant, Morgan introduced Kilbourn to Awdish as his father-in-law. In Kilbourn's presence, Morgan showed Awdish a device that he claimed could detect whether Awdish was wired with a microphone. Awdish was not wearing a wire, and Morgan then handed Awdish a folder containing a large envelope from Continental Vinyl Window Company with $20,000 wrapped in rubber bands. This represented payment for two kilograms of cocaine. Kilbourn then stated

---

1. Ronald Morgan's case was severed from his co-defendants' cases by the district court *sua sponte* when Morgan's counsel was not available on the day of trial. Morgan ultimately pled guilty pursuant to a Rule 11 agreement.

that they planned to take the cocaine to Flint and would return with the money to purchase an additional two kilograms of cocaine. Awdish left the table and called DEA Agent Gilbert to tell him that he had received the money.

Within half an hour, DEA Agent Blackwood entered the restaurant and walked to the table. Posing as a drug supplier, Blackwood asked Morgan and Kilbourn if they had the money. Kilbourn nodded his approval to Morgan, who then slid the folder to Blackwood. After Blackwood received the money, Morgan returned the folder to Kilbourn, and Awdish left to pay the bill. Kilbourn joined Awdish. Blackwood and Morgan then discussed exchanging the money for the cocaine in the parking lot, but Morgan told Blackwood that Kilbourn would decide how the deal would occur because he "runs the show." As they all departed the restaurant, agents arrested the defendants. Morgan attempted to discard the device that monitored wires and microphones, but agents retrieved it. When arrested, Kilbourn had $940 wrapped in the same color rubber bands and in approximately the same denominations as the $20,000 used in the drug buy. Later that day, defendant Harris paged Awdish on his beeper. Awdish returned the call and told Harris that a bust had occurred, and they were all arrested.

A grand jury indicted Harris, Kilbourn, and Morgan and charged each of them with conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841, and attempted possession with intent to distribute cocaine in violation of 21 U.S.C. § 846. Harris also was charged with unlawful use of a communication facility in violation of 21 U.S.C. § 843. A jury found Harris and Kilbourn guilty on all counts. Harris was sentenced to 78 months' imprisonment with four years' supervised release. Kilbourn received a 60–month prison sentence and four years' supervised release.

## II.

### A. Entrapment

■ We first consider Harris' argument that he was entrapped as a matter of law.

Harris contends that it was undisputed that he refused Awdish's offer to sell him cocaine in September 1989, it was undisputed that Harris was in treatment for his addiction, and it was undisputed that Harris informed Awdish in March of 1990 that he had changed his life. Given these allegedly undisputed facts, Harris asserts that he was entrapped unless the government proved his predisposition beyond a reasonable doubt. This the government failed to do, according to Harris. At trial, Harris testified that it was Awdish and not Harris who initiated conversations about cocaine after Harris had rejected Awdish's original overtures in March of 1990. According to Harris, he reluctantly agreed to purchase cocaine from Awdish only after Awdish threatened Harris and his family and "called in" the debt Harris owed for all of the free cocaine he received from Awdish in 1987.

■ The Supreme Court has recognized two elements to a valid entrapment defense: "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). Predisposition "focuses upon whether the defendant was an 'unwary innocent' or instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetuate the crime." *United States v. Barger,* 931 F.2d 359, 366 (6th Cir.1991) (citations omitted). The government certainly may use undercover agents as an aid to law enforcement. The defense of entrapment exists to thwart the government from "originat[ing] a criminal design, implant[ing] in an innocent person's mind the disposition to commit a criminal act, and then induc[ing] commission of the crime so that the Government may prosecute." *Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992).

■ The question of entrapment "is generally one for the jury, rather than for the court." *Barger,* 931 F.2d at 366 (citation omitted). For a defendant to claim successfully that he was entrapped as a matter of law,

the testimony and facts must be undisputed; a court may not choose between conflicting testimony or make credibility determinations. Furthermore, the undisputed evidence must demonstrate a 'patently clear' absence of predisposition. If either of these elements is missing, then the predisposition question is for the jury to decide.

*Id.* (citations omitted). Further, we previously have held that "[i]n determining whether the evidence was, as a matter of law, insufficient to establish predisposition, we must view that evidence in the light most favorable to the prosecution and resolve all reasonable inferences therefrom in its favor." *United States v. McLernon,* 746 F.2d 1098, 1111 (6th Cir.1984).

Viewing the evidence in the light most favorable to the government, we find that Harris failed to produce undisputed evidence on the questions of inducement and predisposition. Thus, the district court did not err in presenting the entrapment defense to the jury.

Briefly, on the question of inducement, Harris insinuates that over a two-year period he continually rejected Awdish's attempts to sell him cocaine. The record is not undisputed on this question, despite Harris' attempts to construe it to the contrary. While Harris claims that he rejected Awdish's offer to sell kilogram quantities of cocaine to him in September of 1989, his characterization of events does not square with Awdish's testimony that Harris was quite interested in a purchase but simply could not generate the financing. Phone logs admitted at trial showed a series of phone calls placed by Harris to Awdish in early October 1989 that appear to corroborate Awdish's testimony, or so a reasonable juror could conclude. Thus, the only undisputed evidence on the question of inducement is that Harris had attempted to clean up his life, had told this to Awdish when Awdish called Harris in March of 1990, and had rejected Awdish's offer to sell him cocaine on that date. However, according to Awdish, Harris then called Awdish and spoke of his interest in purchasing cocaine. Although Harris disputes this characterization of events, whether the government agent

induced Harris is a question best left for the jury under these circumstances.

■  Likewise, on the issue of predisposition, evidence existed from which a reasonable juror could conclude that Harris was predisposed to commit this crime. We have defined predisposition as "the defendant's state of mind *before his initial exposure to government agents.*" *McLernon,* 746 F.2d at 1112 (citation omitted; emphasis in original). The factors that we have deemed relevant in determining whether a defendant is predisposed to commit a crime are:

[1]  the character or reputation of the defendant, including any prior criminal record;

[2]  whether the suggestion of the criminal activity was initially made by the Government;

[3]  whether the defendant was engaged in the criminal activity for profit;

[4]  whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and

[5]  the nature of the inducement or persuasion supplied by the Government.

*Barger,* 931 F.2d at 366.

A review of these factors reveals that the government raised genuine issues as to Harris' predisposition. First, Harris admitted that he had abused drugs for at least eight years, and during much of that time Harris purchased sufficient quantities of drugs to suggest that he was dealing drugs. Second, Harris admitted that he was to receive $1,000 per kilogram of cocaine sold above and beyond the profit he hoped to receive from the sale of drugs he purchased from Awdish. Third, evidence existed that Harris, though initially reluctant, quickly overcame his reticence and sought out Awdish without additional persuasion by Awdish. Although the suggestion of the criminal activity initially was made by the government through Awdish's phone call to Harris in March of 1990, this fact alone is insufficient to establish entrapment. *Id.,* at 367 (collecting cases). Thus, a jury could have concluded beyond a reasonable doubt that Harris was predisposed to committing the offense. The gov-

ernment offered evidence of predisposition and lack of repeated inducement or persuasion, and we therefore reject Harris' contention that his conviction should be reversed.

## B. Jury Note

■ At the beginning of the jury's second day of deliberations, which followed a three-day weekend, the jury sent a note to the court that stated:

> The jury is having a problem with the definition of entrapment could we have a copy of the instructions that were read to us concerning entrapment May we also have a flip chart and some markers Thank you

Without contacting the parties, the court responded by providing the jury with a complete written set of all of the jury instructions read by the court. Harris maintains that the district court erred in not providing him an opportunity to respond to the jury's note.

Under Rule 43 of the Federal Rules of Criminal Procedure, a defendant shall be present "at every stage of the trial." The government concedes that a "technical" error occurred because Harris was not present when the court received the note, but it claims that Harris was not prejudiced. As we previously have held, the rule requiring a defendant's presence at every stage of the trial must be considered with Rule 52(a) of the Federal Rules of Criminal Procedure, providing that harmless error is to be disregarded. *See United States v. Giacalone*, 588 F.2d 1158, 1164 (6th Cir.1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); *see also Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). Thus, we have held that a forbidden communication will not always result in reversal, and the standard asks whether there is "any reasonable possibility of prejudice." *Giacalone*, 588 F.2d at 1165 (quoting *United States v. Reynolds*, 489 F.2d 4, 8 (6th Cir.1973), *cert. denied*, 416 U.S. 988, 94 S.Ct. 2395, 40 L.Ed.2d 766 (1974)). Defendant asserts that prejudice exists here because he was not given an opportunity "to frame an answer that was specific to the jury's concerns regarding entrapment." This claimed preju-

dice simply restates the obvious, for the failure to notify parties of a jury note necessarily results in a lack of opportunity for the parties to respond. Defendant is unable to state a reasonable possibility of prejudice that resulted from the district court's conduct, and we can conceive of none. The court did not make a substantive response to the jury's note, but instead perfunctorily submitted the jury instructions that had been read to the jury previously. *Cf. Giacalone*, 588 F.2d at 1164 (harmless error to tell jury to continue deliberations after receiving a note informing court that jury was deadlocked); *United States v. Florea*, 541 F.2d 568, 570–71 (6th Cir.1976) (harmless error to allow agent to replay tapes admitted into evidence at request of jury, without presence of parties where district court had instructed jury that all exhibits were available), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977); *Reynolds*, 489 F.2d at 7–8 (no reasonable possibility of prejudice when court informed jury that court would not provide additional information about defendant's height). Therefore, any error committed by the trial court in handling the jury's note was harmless.

## C. Awdish's Last Telephone Communication with Harris

■ Finally, Harris contends that Awdish's last phone call to him, which took place after the arrest of Kilbourn and Morgan, violated Harris' Sixth Amendment right to counsel because the conversation occurred after the conspiracy had ended and law enforcement personnel had moved from the "investigatory stage to the accusatory stage." Thus, defendant urges that the district court erred in admitting evidence of the conversation. Harris failed to raise this issue at the trial level. As a general rule, we will not consider issues not presented to and considered by the district court. *United States v. Pickett*, 941 F.2d 411, 415 (6th Cir.1991). We retain discretion to consider issues not previously raised to avoid "a plain miscarriage of justice," but only "to the extent the issue is presented with sufficient clarity and completeness." *Id.* This issue is rife with factu-

al disputes, and we therefore will not consider the merits of defendant's claim.

According to defendant, the phone call from Awdish at approximately 4:47 p.m. on March 26 was placed after criminal charges were filed against Harris and after an arrest warrant was issued against him. It is not clear that Harris' reconstruction of the sequence of events is accurate. Indeed, the government argues that the complaint was filed and the warrant issued after Awdish placed his phone call to Harris. According to the government, the complaint against Harris was not filed until 11:19 a.m. the next day, clearly after Awdish placed his call to Harris. This fact is very important, for Harris' position is that adversary judicial proceedings had begun prior to his phone conversation with Awdish and therefore any statements he made without the presence or waiver of counsel should not have been admitted at trial. *See Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) (once adversary proceedings have begun, the Sixth Amendment right to counsel is violated when the State knowingly exploits the opportunity to record statements of the accused made in the absence of counsel). We do not understand Harris to argue that he has a Sixth Amendment right to counsel even if he had spoken with Awdish prior to the filing of a complaint. Moreover, applicable law belies such an argument, for the government is certainly able to elicit statements[2] from individuals prior to the commencement of adversary judicial proceedings. *See McNeil v. Wisconsin,* —— U.S. ——, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (Sixth Amendment prohibition on the use of incriminating statements deliberately elicited from the accused without the presence or waiver of counsel extends only to the use of such statements in the prosecution of charges for which the accused's right to counsel already

had attached). We decline to address the merits of Harris' argument, because the factual predicate for his contention was not sufficiently developed in the district court.

## III.

### A. Severance

Defendant Kilbourn's first assignment of error is that the trial court erred in denying his motion to sever his case from that of his co-defendants Morgan and Harris. On appeal, Kilbourn claims three grounds in support of his motion. First, he argues that joinder of the cases rendered him unable to call defendant Morgan as a witness. Second, he claims that he was prejudiced by the great disparity of evidence between himself and his co-defendant at trial. Third, Kilbourn argues that the entrapment defense asserted by Harris was antagonistic to his own defense of actual innocence.

■■■■■■ As a general rule, persons indicted jointly should be tried together. *United States v. Stull,* 743 F.2d 439, 446–47 (6th Cir.1984), *cert. denied,* 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). A defendant is not entitled to a severance simply because the proof is greater against a co-defendant. *United States v. Warner,* 971 F.2d 1189, 1196 (6th Cir.1992). When a defendant seeks a severance, he has a heavy burden of showing specific and compelling prejudice, and the denial of a motion to sever will be overruled on appeal only for a clear abuse of discretion. *United States v. Causey,* 834 F.2d 1277, 1287 (6th Cir.1987), *cert. denied,* 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988). Defendant points to nothing that demonstrates an abuse of the trial court's discretion on this issue.

Kilbourn's first claim can be dismissed quickly. When he made his motion for sev-

---

**2.** We assume for the purposes of argument that the confidential informant here was a government agent, and also that he deliberately elicited statements from Harris. Of course, absent those circumstances, Harris would have no claim— even if we concluded that Harris' Sixth Amendment rights had been implicated in this case. *See United States v. Taylor,* 800 F.2d 1012, 1015 (10th Cir.1986) (no Sixth Amendment violation even if cellmate deliberately elicited confession

from defendant and approached prosecutor after defendant confessed because cellmate not government agent), *cert. denied,* 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987); *see also Kuhlmann v. Wilson,* 477 U.S. 436, 460–61, 106 S.Ct. 2616, 2630–31, 91 L.Ed.2d 364 (1986) (no Sixth Amendment violation when government places defendant in jail cell with informant and informant asked no questions and simply listened for the identities of accomplices).

erance, Kilbourn was to have been tried along with Morgan and Harris. Thus, as a reason for severance, Kilbourn stated his inability to call Morgan as a witness because the two were to be tried together. Kilbourn's motion was ultimately denied by the trial court. On the day of trial, however, Morgan's trial was severed *sua sponte* by the trial court, and therefore Kilbourn was no longer unable to call his co-defendant as a witness. Kilbourn continues to argue this claim on appeal, but the sequence of events prior to his trial makes this argument unpersuasive. Co-defendants Morgan and Kilbourn did have their trials severed as Kilbourn wished, and simply because it was Morgan rather than Kilbourn whose trial was severed was of no consequence.

Further, even assuming that the evidence was stronger against Harris than against Kilbourn, disparity of evidence is generally not enough to cause the granting of a separate trial. *See Causey*, 834 F.2d at 1287–88. As we previously have stated, "[t]he jury must be presumed capable of sorting out the evidence and considering the case of each defendant separately." *United States v. Warner*, 690 F.2d 545, 553 (6th Cir.1982). In this case, Kilbourn maintains that the evidence of Awdish's relationship with Harris in 1987 prejudiced Kilbourn's defense, for the jury was told of Harris' significant drug use. We fail to see how this evidence prejudiced · Kilbourn, for the specter of drugs was prevalent throughout the trial. *Cf. United States v. Gallo*, 763 F.2d 1504, 1525 (6th Cir.1985) (refusing to find "spillover effect" although "highly inflammatory testimony concerning ... gruesome and brutal murders" had been admitted with regard to another defendant), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986).

■ Finally, Kilbourn characterizes his defense and Harris' defense as antagonistic. We previously have stated that defendants have the burden "to show that an antagonistic defense would present a conflict 'so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *Warner*, 971 F.2d at 1196. In this case, Kilbourn has failed to demonstrate that

his defense is irreconcilable with that of co-defendant, much less antagonistic. Harris claimed entrapment, whereas Kilbourn asserted his innocence. These defenses are not inconsistent, for a jury could have determined that the government did entrap Harris and that Kilbourn was present at the Denny's restaurant for reasons independent of a drug sale. Antagonistic defenses arise when one person's claim of innocence is predicated solely on the guilt of a co-defendant. *See United States v. Crawford*, 581 F.2d 489 (5th Cir.1978) (two defendants tried together in a joint trial take the stand and accuse the other of committing the crime). That is not our case. Thus, we conclude that the trial court did not abuse its discretion in denying Kilbourn's motion for severance.

### B. Statement Regarding Willingness to Take a Polygraph Test

■ At trial, DEA Agent Hendrie testified that when Kilbourn was arrested at the Denny's restaurant he told Agent Hendrie that he had gone to the restaurant with Morgan to discuss the establishment of a water distilling business. In the same statement, Kilbourn also expressed his willingness to take a polygraph test in the presence of his attorney. The test was never taken, and the trial court declined to admit Kilbourn's . statement regarding the polygraph. On appeal, Kilbourn claims that the failure to admit this statement was error, for it allegedly bolstered his credibility. The government responds that the statement was only "marginally relevant," and the district court did not abuse its discretion in concluding that admission of the statement might tend to confuse the jury. Further, the government argues that Kilbourn offered to take the test only in the presence of his attorney and did not stipulate that the results of the polygraph would be admissible in evidence, thereby diluting any relevance the statement itself might have.

■ In limited circumstances, evidence of a party's willingness to submit to a polygraph may, within the discretion of the trial court, become admissible if it is relevant at trial. *Wolfel v. Holbrook*, 823 F.2d 970, 972 (6th Cir.1987), *cert. denied*, 484 U.S.

1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988). In considering the admissibility of polygraph-related evidence, this circuit follows Federal Rule of Evidence 403. Thus, the trial court must first determine whether the proffered evidence is relevant. If the court finds that the evidence is relevant, it must then balance the probative value of the evidence against the hazard of unfair prejudice and jury confusion. *Id.; Murphy v. Cincinnati Ins. Co.,* 772 F.2d 273, 277 (6th Cir.1985). We review the court's conclusion on this matter for an abuse of discretion. *United States v. Betancourt,* 838 F.2d 168, 175 (6th Cir.), *cert. denied,* 486 U.S. 1013, 108 S.Ct. 1748, 100 L.Ed.2d 210 (1988).

We agree with the government that Kilbourn's willingness to submit to polygraph testing, in the presence of an attorney, was marginally relevant at best on the issue of credibility. Kilbourn did not agree to allow the results of any such examination, whatever they might reflect, to be admitted into evidence at a subsequent trial. Hence, he did not have the requisite "adverse interest at stake to cloak his willingness with credibility." *Wolfel,* 823 F.2d at 974; *see also Barnier v. Szentmiklosi,* 810 F.2d 594, 597 (6th Cir.1987). In *Barnier,* we concluded that the trial court had erred in admitting evidence of a polygraph examination to bolster plaintiffs' credibility, for we doubted that the plaintiffs, who had sued a local prosecutor for malicious prosecution, "would volunteer to take the test unless for the purpose of reporting its results to the prosecutor if the results were deemed by their attorney to be favorable. If unfavorable, presumably the results would not have been revealed." *Id.* Thus, we find that the trial court did not abuse its discretion in refusing to allow admission of Kilbourn's statement regarding the polygraph.

## C. Sufficiency of the Evidence

Finally, Kilbourn alleges that the evidence was insufficient to support his convictions. In reviewing a jury's verdict under a sufficiency of the evidence standard, this court asks whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). A defendant raising a sufficiency argument bears a "very heavy burden." *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986). Kilbourn has failed to meet that burden in this case.

Kilbourn claims that only five pieces of evidence would go to his participation, and all of that evidence is suspect. We need not quarrel with Kilbourn's characterization of the evidence, for we find the jury's verdict sustainable through reliance on that evidence alone.

First, when the DEA arrested him, Kilbourn had $940 in his possession, which agents said was bound in a rubber band similar to those on the $20,000 co-defendant Morgan used to attempt to purchase cocaine. Kilbourn said that his son-in-law Morgan gave him the money as a loan to make delinquent car payments in return for a ride to Detroit. Second, the DEA agent that posed as a drug dealer on the day of the arrest testified that when he met Kilbourn and Morgan at the restaurant, he asked if they had the money. The agent then said that Kilbourn nodded at Morgan, who then passed the money to the agent. Kilbourn argues that just as the jury could infer from Kilbourn's nod that he was participating in the purchase, so too could it infer that Kilbourn believed Morgan was going to the Denny's restaurant to repay a legitimate loan and his nod represented his assent to his son-in-law to repay the loan. Third, the undercover agent testified that Morgan told him that Kilbourn ran the show, but Kilbourn implicitly asserts that this statement is less than trustworthy because it was made outside of his hearing. Fourth, Larry Awdish testified that Kilbourn twice told him that the defendants would take two kilos that day and return for more two days later. Kilbourn portrays Awdish as "a convicted drug dealer working off a possible life sentence" who gave conflicting testimony as to when these statements by Kilbourn were allegedly made, thereby exposing the inherently unreliable aspects of these statements. Fifth, the money paid to the DEA agent by

Morgan for the drugs was in a binder that belonged to Kilbourn and was within an envelope with a return address of the construction company for which Kilbourn worked. Kilbourn testified that Morgan borrowed the binder and envelope during the ride to Detroit, but Kilbourn professed not to know why he needed the binder and envelope. Kilbourn's attacks on this evidence are similar to the arguments that failed before the jury. For instance, Kilbourn was able to develop at trial his derisive characterization of Awdish as a convicted drug dealer "working off a possible life sentence." It is not our function to discredit testimony the jury has obviously believed. His testimony, and that of the undercover agent who stated that Kilbourn nodded when asked if they had the money, would allow a reasonable juror to conclude that Kilbourn was a partner with Morgan in this drug dealership. Coupled with the physical evidence that the binder and envelope apparently belonged to Kilbourn and Kilbourn possessed $940 in fresh, crisp bills that resembled and were banded like the $20,000, we find that the evidence was sufficient to sustain Kilbourn's convictions.

**AFFIRMED.**

KEITH, Circuit Judge, concurring.

I concur with the majority's finding that the trial judge's communication with the jury without contacting Harris' counsel was harmless error without prejudice. I write separately, however, to express my pressing concern for the criminal defendant's right to be present during all stages of the trial and to condemn the violation of this right, regardless of the absence of harm or prejudice.

The Federal Rules of Criminal Procedure establish the right of defendants to be present at all stages of trial. Fed.R.Crim.P. 43(a). "[I]nsofar as due process is concerned, th[is] statutory right is at least as far-reaching as the constitutional right." *United States v. Alessandrello,* 637 F.2d 131, 138 (3d Cir.), *cert. denied,* 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1980) *citing* 8B Moore's Federal Practice ¶ 43.02(1), at 43–67 (2d ed. 1980). A trial judge severely imposes on this right by, as in this case, communicating with the jury without first contacting the defendant or his counsel. *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975).

Various rationales for this right aim at preventing unfair prejudice to defendants. Communication between a judge and jury without defense counsel present interferes with appellate review by preventing the parties from recording the context in which the judge's remarks were made. Neither the parties nor the appellate court are apprised of important nuances such as the judge's tone of voice and physical demeanor. Moreover, unconscious statements of a judge's personal views, left unchallenged by counsel, may enhance the opportunity for miscommunication of the law. The judge may disturb "the delicate balance of legal principles set forth in the original instructions." *United States v. Burns,* 683 F.2d 1056, 1059 (7th Cir.1982).

In the present case, these concerns are not as important because the trial judge sent jurors a typed copy of instructions previously given. Despite good intentions and the absence of prejudice, however, the communication blatantly violated the explicit right stated in Rule 43(a). Ignoring this right insults fundamental fairness, distracts from the appearance of justice and immeasurably damages public faith. A defendant's right to be present for all aspects of the trial should not be outweighed by convenient procedure.