35 F.3d 567
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Neeran ZAIA and Hazim Saeegh, Defendants-Appellants.
 Nos. 93-1452, 93-1454.
 United States Court of Appeals, Sixth Circuit.
 Sept. 2, 1994.
 
 Before: KENNEDY and SILER, Circuit Judges; and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Neeran Zaia was convicted by jury trial on three counts of bribery, seven counts of visa fraud, and one count of alien smuggling; she was sentenced to fifteen months of imprisonment. Her co-defendant Hazim Saeegh was convicted on one count of bribery and received a sentence of eight months. Zaia claims entrapment, insufficiency of the evidence, and outrageous government conduct, as well as jury misconduct and, finally, error in the failure of the sentencing court to grant her request for a downward departure. Saeegh claims error in the sentencing court's failure to reduce his base offense level due to his mitigating role in the offense.[1] We AFFIRM the convictions and sentences as entered by the district court.
 
 I.
 
 2
 Zaia, who is a former Iraqi citizen and a Chaldean Catholic, operates a travel agency in Detroit. In the wake of the Persian Gulf War, she contracted with other Chaldean Catholics living in Iraq or Jordan to help them escape from persecution and likely death at the hands of the Iraqi Secret Police. She proposed to acquire Mexican or Canadian visas for her clients, charging up to $5000 per person for her expertise. She escorted a group of sixteen such persons from Amman, Jordan to the Dominican Republic in October 1991. Eventually, she obtained fraudulent United States visas for twelve of them and arranged for four others to travel to the United States by way of Mexico. The latter four eventually entered the United States illegally without visas, where they were met by Appellant Saeegh and others.
 
 
 3
 Zaia had obtained World Service Authority (WSA) passports for the members of her group, but was unable to obtain visas[2] for these passports, since the WSA is a private organization whose passports are not recognized by any government. The United States Embassy in the Dominican Republic refused to issue visas for these passports. The group then traveled to Nicaragua and Guatemala, but had no better luck there. After failing in her attempts to acquire Mexican or United States visas for her clients, Zaia took the group to Belize in January 1992. There she approached Sue Williams, the owner of the motel where the group was staying, and asked for help contacting someone "at the embasssy that could help them get visas to the United States." She suggested that she and Ms. Williams "both could make lots of money" if she acquired the proper contact.
 
 
 4
 Williams contacted the United States Consul in Belize, Rudolph Boone, who was already aware of the Iraqis' presence. He testified at trial that he had learned from an earlier State Department cable that Zaia had already attempted to bribe a Guatemalan official in order to obtain visas for her group. When Boone informed Washington of what was transpiring, two special agents were sent to Belize City. Boone was "wired" to record his conversations and proceeded to approach Zaia and offer his assistance in obtaining visas for her group. All conversations between the two were tape recorded and later transcribed.
 
 
 5
 Their first meeting took place on February 5, 1992, at Mom's Restaurant, owned by Williams. Boone attempted to offer his services to Zaia. The government contends that it was Zaia who first suggested paying Boone for the visas. In response to Boone's inquiry ("What's in it for me?"), Zaia stated that "[w]e're going to make money, you know." Later Boone persisted by asking: "How much is this worth to you?"; and: "Well, what kind of money, what are we talking about?" It was only then that Zaia responded by specifically offering to pay for the visas. Zaia gave Boone four passports at that time, which eventually involved five fraudulent visas, resulting in the first five counts of the indictment, on which charges Zaia was acquitted. Zaia gave Boone money on February 5 and 6, and again on February 10, for which she was charged with four counts of bribery and also acquitted by the jury.
 
 
 6
 More meetings followed, with Zaia eventually paying Boone for twelve fraudulent visas. Of these, she was convicted on charges stemming from the seven visas obtained for passports given to Boone on February 10 and 11, as well as on the bribery charges arising from the money she gave Boone on February 11 at two separate meetings. These transactions were also the basis for her conviction on the alien smuggling charge. Some of the twelve Chaldeans with visas then flew with Zaia to New Orleans, while the others flew to Houston. The four remaining members of the group had already been sent into Mexico and told to cross the Rio Grande River at night at a spot near Brownsville, Texas, where they met Saeegh and several of their relatives. Two of the four testified that it was Zaia's idea to send them into Mexico. Eventually, everyone traveled to Detroit. Boone also came to Detroit, where on February 20, 1992, he met with Zaia and Saeegh and discussed expanding the fraudulent visa scheme to include more Iraqis who wished to leave their country. At that meeting, Saeegh requested Boone's help in an immigration petition for an elderly Iraqi woman. The next day, February 21, Zaia and Saeegh were videotaped in Boone's hotel room, Zaia giving Boone $500 and Saeegh giving him the immigration file for the Iraqi woman. Zaia denies participating in this transaction, for which she received her final bribery conviction; Saeegh also received his single count of conviction, for bribery, on the basis of this meeting.
 
 II.
 
 7
 The defendants raise several issues on appeal.
 
 
 8
 A. Did the district court err in denying Zaia's motion for judgment of acquittal because the government failed to prove beyond a reasonable doubt that she was not entrapped?
 
 
 9
 Zaia moved at the conclusion of the proof for a Rule 29 judgment of acquittal based upon the defense of entrapment as a matter of law. The district court denied the motion and submitted the entrapment issue to the jury. Entrapment as a valid defense has two elements: (1) " 'government inducement of the crime,' " and (2) " 'a lack of predisposition on the part of the defendant to engage in the criminal conduct.' " United States v. Barger, 931 F.2d 359, 366 (6th Cir.1991) (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)). For a court to find entrapment as a matter of law, the
 
 
 10
 testimony and facts must be undisputed; a court may not choose between conflicting testimony or make credibility determinations. Furthermore, the undisputed evidence must demonstrate a "patently clear" absence of predisposition. If either of these elements is missing, then the predisposition question is for the jury to decide.
 
 
 11
 Id. (internal quotation marks omitted). In making this determination, all evidence must be viewed in the light most favorable to the prosecution. Id.
 
 
 12
 "The question of entrapment 'is generally one for the jury, rather than for the court.' " United States v. Harris, 9 F.3d 493, 497 (6th Cir.1993) (quoting Barger, 931 F.2d at 366). However, "a defendant's predisposition must be proven beyond a reasonable doubt, and predisposition [is] the defendant's state of mind before his initial exposure to government agents." United States v. Clark, 957 F.2d 248, 250 (6th Cir.1992) (internal quotation marks omitted) (emphasis added). "Where the Government simply gives the defendant 'an opportunity to commit a crime,' and the defendant accommodates by committing a crime, the entrapment claim is unavailable." United States v. Kussmaul, 987 F.2d 345, 349 (6th Cir.1993) (quoting Jacobson v. United States, 112 S.Ct. 1535, 1541 (1992)). Moreover, "it has been held that the fact a government agent proposed an illicit transaction ... is insufficient to establish entrapment." Barger, 931 F.2d at 367.
 
 
 13
 Zaia cites to Jacobson, in which the Supreme Court found that the defendant had been entrapped, as well as to the recent Seventh Circuit decision in United States v. Hollingsworth, 9 F.3d 593 (7th Cir.1993), vacated, reh'g en banc granted, 1994 U.S.App. LEXIS 588 (7th Cir. Jan. 10, 1994). Hollingsworth relies upon Jacobson to support the distinction between a defendant's being "willing" to commit a crime, meaning that she desires the outcome of the imagined illegal act, and her being "ready" to commit that crime, meaning that she is prepared to take the steps necessary to complete the actual crime. 9 F.3d at 598-99.[3] The case law in our circuit, however, is more in line with the Hollingsworth dissent's reliance upon Jacobson for the proposition that "predisposition is demonstrated by the defendant's 'ready commission of [a] criminal act.' " Hollingsworth, 9 F.3d at 603-04, 1994 WL 236976, at * 20 (Ripple, J., dissenting) (quoting Jacobson, 112 S.Ct. at 1541) (also citing Kussmaul, 987 F.2d at 349). In Kussmaul, we rejected the defendant's argument that Jacobson requires that "the Government's proof of predisposition must be established with evidence obtained prior to its initial contact with the targeted individual." 987 F.2d at 348. We found no entrapment as a matter of law because the sting operation which ensnared the defendant "did not exhibit the persistent and overzealous Government pursuit of a reluctant and unresponsive individual over an extended period of time which so offended the Jacobson Court." Id. at 349.
 
 
 14
 The same logic applies to this case. A close reading of the transcript of the first meeting between Zaia and Boone indicates that, regardless of who first suggested that the visas could be obtained for money, Zaia very quickly warmed to the idea. She showed no reluctance whatsoever to break the law. In addition, a reasonable juror could conclude that Zaia had already indicated to Williams, as stated heretofore, that she was willing to pay for United States visas and to offer a bribe to the United States Consul in order to obtain them.
 
 
 15
 Zaia argues that the strength of the government inducement, under the circumstances of impending deportation and possible execution for some or all of her clients, made it virtually impossible for her to resist the government's entrapment. Citing Hollingsworth, she argues that "the stronger the inducement, the more difficult it is for the government to prove predisposition." Zaia also points to evidence in her favor showing that she did in fact pursue various legal means on behalf of her clients, without success, prior to resorting to bribery.
 
 
 16
 Viewing all of the evidence in the light most favorable to the government, however, justifies the inference that Zaia was not only predisposed to commit the crimes for which she was convicted but was also planning to perpetuate her scheme of using fraudulent visas to enable other Iraqis to enter the United States, even after she had safely returned to Detroit with her sixteen clients, so that, as she told Boone, "we're going to make money, you know," or as she told Williams, "we both could make lots of money." A reasonable juror could find from the evidence that Zaia was contemplating a continuing course of criminal activity. Such an inference undermines her entrapment defense.[4] The government presented sufficient evidence at trial to enable a reasonable juror to find beyond a reasonable doubt that Zaia was not entrapped by government agents.[5]
 
 
 17
 B. Was there sufficient evidence to convict Zaia on the bribery charge stemming from the Detroit meetings?
 
 
 18
 "In addressing sufficiency of the evidence questions, this Court has long recognized that we do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." United States v. Hilliard, 11 F.3d 618, 620 (6th Cir.1993), cert. denied, 114 S.Ct. 1099 (1994). Our role is to determine whether all of the evidence --viewing it in the light most favorable to the government and drawing all reasonable inferences in the government's favor--could justify any rational trier of fact in concluding that each element of the crime has been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). See also United States v. Sturman, 951 F.2d 1466, 1474 (6th Cir.1991), cert. denied, 112 S.Ct. 2964 (1992); United States v. Head, 927 F.2d 1361, 1365 (6th Cir.), cert. denied, 112 S.Ct. 144 (1991). If we determine that the evidence could justify such a conclusion, a claim based upon insufficiency of the evidence must fail. Moreover, the evidence presented by the government "need not remove every reasonable hypothesis except that of guilt." United States v. Stone, 748 F.2d 361, 362 (6th Cir.1984).
 
 
 19
 In this light, we reject Zaia's claim that she was "merely present" at the Detroit meetings and did not participate in the bribery scheme there. She was videotaped handing Boone the $500 pay-off money. Her appeal on this point, that the evidence is insufficient to support a reasonable jury's conclusion that she was guilty of bribery, is without merit.
 
 
 20
 C. Was the district court's failure to clarify the jury instructions on entrapment, when so requested by the jury, a violation of Zaia's constitutional rights?
 
 
 21
 Zaia failed to object to the jury instructions on entrapment at trial, so we review her claim here under the doctrine of plain error. The jury was given the Sixth Circuit Pattern Instruction 6.03 on entrapment, but during the course of its deliberations, it requested a clarification on the entrapment defense, which the district court refused to give. Zaia did not object to this refusal at that time. She now argues, however, that the entrapment instruction was "misleading, or g[a]ve an inadequate understanding of the law." See United States v. English, 925 F.2d 154, 158 (6th Cir.), cert. denied, 501 U.S. 1210, 501 U.S. 1211 (1991) (internal quotation marks omitted). She argues that the pattern instruction was misleading in light of the Jacobson case, which was decided after our pattern instruction was written but prior to the trial in this case.
 
 
 22
 We cannot agree. The pattern instruction includes the following statement: "The crucial question in entrapment cases is whether the government persuaded a defendant who was not already willing to commit a crime to go ahead and commit it." Pattern Criminal Jury Instructions of the Sixth Circuit Sec. 6.03(4) (West 1991). We do not see how Jacobson makes this instruction misleading or an inadequate expression of the law, which is the test for the correctness of jury instructions. English, 925 F.2d at 158. It would be anomalous for us to find one of our own pattern instructions to be erroneous; this is especially true when the test here is whether the inadequacy of the instruction rises to the level of plain error, i.e., whether the error is "clear" or "obvious." United States v. Olano, 113 S.Ct. 1770, 1777 (1993).
 
 
 23
 "The trial court is vested with broad discretion in formulating its charge and will not be reversed unless the charge fails accurately to reflect the law." English, 925 F.2d at 158 (internal quotation marks omitted). The jury was told that it could convict Zaia only if it could find beyond a reasonable doubt that, despite the effects of government persuasion, she was "already willing to commit a crime." Jury Instructions Sec. 6.03 (emphasis added). Such an instruction accurately reflects the law of entrapment, even with the gloss placed upon it by Jacobson.
 
 
 24
 D. Did the government engage in outrageous conduct in the investigation of Zaia?
 
 
 25
 The Supreme Court has held that it is possible for the conduct of law enforcement agents to be so outrageous as to violate a defendant's due process rights. United States v. Russell, 411 U.S. 423, 431-32 (1973). Such conduct must be so egregious as to violate fundamental fairness and to be "shocking to the universal sense of justice." Id. at 432; see also United States v. Barger, 931 F.2d 359, 363 (6th Cir.1991). Whether or not a due process violation exists is a conclusion of law, which we review de novo. See id.; United States v. Levy, 904 F.2d 1026, 1029 (6th Cir.1990), cert. denied, 498 U.S. 1091 (1991). We have established a four-part test for outrageous conduct: "(1) the need for the police conduct as shown by the type of criminal activity involved, (2) the impetus for the scheme or whether the criminal enterprise preexisted the police involvement, (3) the control the government exerted over the criminal enterprise, and (4) the impact of the police activity on the commission of the crime." Barger, 931 F.2d at 363.
 
 
 26
 The government points out that Zaia was the one who first approached Williams about making contact with an employee of the United States embassy in Belize (the "impetus" prong of the Barger test), and that Zaia on her own, without any government participation or knowledge, sent four of her clients into Mexico illegally, without visas of any kind (the "control" and "impact" prongs). It was also Zaia who selected which passports to give to Boone (the "control" prong); and it was Zaia who created the need for her illegal activities by bringing her clients to Belize without any realistic chance of obtaining legitimate visas for them (the "impetus" prong). The government argues that, in order to investigate Zaia's apparent interest in obtaining fraudulent visas, it had no choice but to present someone to be bribed, namely Boone (the "need" prong). We conclude that Zaia showed enough initiative in the conduct of the criminal activities at issue here to prevent our finding that the government conduct in this case was so outrageous as to "shock the universal sense of justice."[6]
 
 
 27
 E. Was it error for the district court to refuse to conduct an evidentiary hearing into allegations of jury misconduct and false statements made during voir dire?
 
 
 28
 Zaia makes two related claims of juror misconduct: (1) her due process right to a fair trial was violated because of ethnic prejudice against her on the part of certain members of the jury, and (2) these jurors lied during voir dire when they denied having any prejudice against the defendants. Zaia requests an evidentiary hearing concerning these matters. When a defendant makes an allegation of misconduct during jury deliberations, "[i]t is within [the trial judge's] discretion to determine what manner of hearing, if any, is warranted." United States v. Wilson, 534 F.2d 375, 379 (D.C.Cir.1976). Zaia bases her claims on a letter sent by juror Trudy Miller to defense counsel, which states in pertinent part: "I heard many statements in that room that sounded prejudice [sic], and of course they denied it!" Both parties agree that F.R.E. 606(b), concerning inquiry into the validity of a verdict, precludes a juror's testimony and also a juror's affidavit or statement regarding "any matter or statement occurring during the course of the jury's deliberations," except with regard to "extraneous prejudicial information" or "outside influence ... improperly brought to bear."
 
 
 29
 The government argues convincingly that the two stated exceptions are the only ones recognized as allowing for the possibility of an evidentiary hearing concerning the validity of a verdict. The allegations of prejudice made by juror Miller do not fall within either of these exceptions. The Supreme Court ruled in Tanner v. United States, 483 U.S. 107 (1987), that the district court had not erred by refusing to hold an evidentiary hearing concerning a juror's post-verdict allegations accusing other jurors of alcohol and drug abuse during the course of the trial and the jury deliberations. In the same vein, the Seventh Circuit in Shillcutt v. Gagnon, 827 F.2d 1155 (7th Cir.1987), reiterated the importance of protecting the "fruitful exchange of ideas and impressions among jurors" by assuring them that their comments "will not reach a larger audience." Id. at 1159. Only in cases of the "extremely rare abuse" that has denied a juror her due process right to a fair trial will an evidentiary hearing be required. In Shillcutt, the following statement was made by a juror about the defendant and reported by a fellow juror: "Let's be logical; he's a black, and he sees a seventeen year old white girl--I know the type." The court held that this did not amount to the type of "prejudice pervad[ing] the jury room" that would necessitate an evidentiary hearing. Id. In the case at hand, there is even less evidence of actual prejudice against the defendant Zaia. Juror Miller heard statements that "sounded [like] prejudice." We decline on that basis to interfere with the sound discretion exercised by the district court in denying Zaia's motion for an evidentiary hearing regarding jury misconduct.
 
 
 30
 Zaia also claims the district court erred in denying an evidentiary hearing based upon false answers to voir dire questions. In McCoy v. Goldston, 652 F.2d 654 (6th Cir.1981), we stated that an evidentiary hearing on a juror's alleged failure to disclose information during voir dire will be held only if the movant "has presented a sufficient evidentiary basis to raise a fact issue of prejudice," id. at 659, and that "the allegations in the moving papers must be sufficiently specific, detailed, and nonconjectural so that fact issues are raised." Id. at 659 n. 9 (emphasis added). See also Marks v. Shell Oil Co., 895 F.2d 1128, 1130 (6th Cir.1990).
 
 
 31
 In the case at hand, Zaia has failed to point to the specific and nonconjectural fact issues required as a basis for granting her motion for an evidentiary hearing. The only basis for her claim is the highly speculative inference, drawn by a single juror, that her fellow jurors harbored racial and ethnic prejudice against the defendants. The accusing juror admits, however, that her fellow jurors, when confronted, denied the allegations of prejudice. We will not disturb on such an insubstantial basis the district court's exercise of discretion in denying Zaia's request for an evidentiary hearing regarding voir dire impropriety.
 
 
 32
 F. Was it error for the sentencing court to fail to use its discretionary authority to grant Zaia's request for a downward departure in her sentence?
 
 
 33
 "A district court's failure to depart from the Guidelines range is not cognizable on appeal ... when the district court properly computes the Guidelines range, imposes a sentence that is not illegal or did not result from an incorrect application of the Guidelines range, and is not unaware that it had discretion to depart from the Guidelines range." United States v. Brannon, 7 F.3d 516, 521-22 (6th Cir.1993). Zaia argues that the district court was unaware that it possessed the discretion to depart from the Guidelines based upon Sec. 5K2.11, which allows a downward departure when "a defendant [has committed] a crime in order to avoid a perceived greater harm." The sentencing court did, however, consider the possibility of a departure under Sec. 5K2.11, but rejected it because "it isn't the kind of departure that 5K2.11 is talking about, number one. And, number two, because it was of a continuing nature. That she still met and tried to initiate or to be part of bribery, it kind of offsets that." Zaia's appeal on this issue is therefore without merit.
 
 
 34
 G. Was it error for the sentencing court to fail to reduce Saeegh's sentencing level due to his mitigating role in his offense of conviction?
 
 
 35
 Saeegh argues on appeal that the district court's failure to reduce his base offense level due to his mitigating role in the offense, pursuant to U.S.S.G. Sec. 3B1.2, was clear error, as was its failure to make specific factual findings regarding a matter in the presentence report to which he objected, pursuant to Fed.R.Crim.P. 32(c)(3)(D). "The district court's findings of fact regarding whether [defendant] is entitled to [a] reduction will be reviewed only for clear error. Defendant must prove by a preponderance of the evidence that he is entitled to the reduction." United States v. Moss, 9 F.3d 543, 554 (6th Cir.1993) (citation omitted).
 
 
 36
 Saeegh argues that the district court's failure to decrease his offense level contradicts various statements it made at the sentencing hearing to the effect that "Ms. Zaia was the organizer--she was the supervisor to a great extent," and that "[Saeegh's] role was substantially less than the other defendant in relation to the criminal activity." On the other hand, the district court also found that Saeegh "to some extent--in relation to this particular matter [i.e., apparently, in relation to the activity forming the basis for his sole count of conviction]--was motivated by the fact that he did know what was happening. I don't think there's any question about it." (Emphasis added). Earlier, the district court found that "there's nothing in the testimony or otherwise that would lead the Court to believe that he's entitled to either anything mitigating or anything for increasing."
 
 
 37
 The district court ostensibly relied upon the videotape of Saeegh handing the immigration file to Boone on February 21, 1992, recorded in Boone's Detroit hotel room, as well as upon Boone's testimony regarding Saeegh's involvement, during Boone's Detroit visit, in the attempt to obtain a fraudulent visa by offering Boone a bribe. The government argues that the district court's statements referred to by Saeegh concerned his role in the overall scheme to help the Chaldeans enter the United States illegally, which role was admittedly "substantially less" than that of Zaia, but that the court also found that Saeegh's role in the single count for which he was convicted did not warrant a mitigating role reduction. We agree. Although the district court could have more clearly stated the factual basis for its conclusion that Saeegh was not entitled to a reduction, it did find that Saeegh had knowledge of the "particular matter" involving his count of conviction and based its decision, at least in part, upon that finding.
 
 
 38
 The testimony of Boone established that Saeegh "seemed very well acquainted with all the events" involving the twelve Iraqis constituting Zaia's group in Belize, and that Saeegh participated roughly as an equal with Zaia in the discussions concerning the immigration file at issue in his count of conviction, although Saeegh rightfully points out that Boone was unsure as to many of the specifics of Saeegh's involvement in these discussions. There is apparently no dispute that Saeegh did in fact hand Boone the immigration file, for which he sought special treatment, shortly before he was arrested. Under a different set of circumstances, we have held that a sentencing court's factual finding concerning the quantity of drugs to be counted against a defendant is "adequate" even when limited to the single statement that " 'I think the jury chose to believe the former [explanation of what the defendant had done] and I think that is a reasonable determination.' " United States v. Todd, 920 F.2d 399, 408 (6th Cir.1990). Accordingly, we find that the sentencing court in the case at hand also made an adequate factual finding in rejecting Saeegh's request for a reduction in his sentencing level.
 
 
 39
 Finally, Saeegh has failed, on appeal and apparently also at the district court, to point to any factual matter to which he objected in the presentence report. His resort to Fed.R.Crim.P. 32(c)(3)(D) is therefore unavailing. Essentially, as the government asserts, he is arguing that the district court failed to make an adequate factual finding concerning the mitigating role issue. We addressed that argument above and found it insufficient to require resentencing for Saeegh.
 
 III.
 
 40
 For the reasons stated above, we AFFIRM the convictions and sentences of both appellants, as entered by the district court.
 
 
 
 [1]
 The commentary to Guidelines section 3B1.2 on "Mitigating Role" provides that "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." U.S.S.G. Sec. 3B1.2, comment. (n. 1). Moreover, "a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." Id., comment. (n. 3)
 
 
 [2]
 A visa is a government-issued stamp on a passport enabling the passport holder to visit or reside in the issuing country
 
 
 [3]
 The original decision in Hollingsworth, 9 F.3d 593, was vacated and the case was heard en banc. The subsequent opinion nevertheless reached the same outcome as the original panel, but specifically stated: "We do not suggest that Jacobson adds a new element to the entrapment defense--'readiness' or 'ability' or 'dangerousness' on top of inducement and ... predisposition." United States v. Hollingsworth, --- F.3d ----, 1994 WL 236976, * 3 (7th Cir. June 2, 1994) (en banc)
 
 
 [4]
 The government details other evidence to the same effect (e.g., the attempt to bribe a Guatemalan immigration official prior to arriving in Belize; the "inconsistent and false accounts she gave to various people" concerning her group's travel plans)
 
 
 [5]
 Zaia also argues that the fact that she was acquitted on the earlier counts and convicted only on the later ones shows that the jury believed that she was not predisposed to commit these crimes from the beginning, prior to the influence of the government agents, but only became so after being induced into criminal activity by the government. We decline, however, to go behind the jury verdict in order to dissect hypothetical rationales for the jury's disposition of the various counts against Zaia
 
 
 [6]
 It should be noted that a recent Sixth Circuit panel decision has held, as a matter of law, that the defense of "outrageous government conduct" no longer exists. United States v. Tucker, --- F.3d ----, 1994 WL 363882 (6th Cir. July 15, 1994). The Tucker court explained that a defendant who now relies on the defense of inducement is "limited to the defense of entrapment and its key element of predisposition." Id. at * 7