**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Agustin CERVANTE, Defendant–Appellant.**

**No. 91–1953.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 29, 1992.

Decided March 9, 1992.

Kaarina Salovaara (argued), Barry R. Elden, Asst. U.S. Atty., Office of U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for U.S.

Thomas J. Organ (argued), Cisco & Organ, Chicago, Ill., for defendant-appellant.

Before FLAUM and KANNE, Circuit Judges, and PELL, Senior Circuit Judge.

FLAUM, Circuit Judge.

On January 10, 1991, a jury convicted Agustin Cervante of knowingly and intentionally attempting to possess with intent to distribute approximately three kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). The district court denied Cervante's post-trial motion for judgment of acquittal notwithstanding the verdict or for a new trial and sentenced him to 78 months imprisonment followed by four years supervised release. His sole argument on appeal is that the government did not present sufficient evidence for the jury to reject his entrapment defense. We affirm.

Cervante's arrest was the fruition of undercover work by the government and its informant Angel Rios, a large-scale cocaine dealer who was $1 million in debt to a Columbian drug supplier. Cervante and Rios met long before Rios began cooperating with the government. According to Rios, he and Cervante were introduced in late 1988 by Pedro Solarte, a cocaine dealer who had participated with Rios in numerous drug deals, at Medinah TV, a television repair shop owned by Solarte. Two or three days after this initial meeting, Rios and Cervante again met at Medinah TV, at which time Rios asked Cervante if he knew

a man named "Crazy Tony" Gonzalez. According to Rios, Gonzalez owed him money for 45 kilograms of cocaine. Cervante responded that he did not know Gonzalez, but would contact Rios if he found out anything. Rios testified that Cervante then asked him if he had any "merchandise"—which Rios understood to mean cocaine—to which Rios replied he was dry at the time. Cervante also asked Rios about the price of cocaine, and Rios responded that when he was ready, he would let Cervante know. Cervante told Rios to contact Solarte when he got some cocaine and Solarte would relay the message to him. Cervante assured Rios that this would not be a problem.

One month later, Rios and Solarte visited Cervante at a west side electronics shop owned by Cervante. According to Rios, Cervante greeted him by saying, "I thought you were already coming with something. I thought you already had something ready, a job, some merchandise [cocaine]." Rios responded that he did not yet have any "merchandise." At the end of January 1989, Rios and Cervante once again met at Medinah TV, where Cervante introduced Rios to a man named Mario. Rios testified that Cervante told him that he (Cervante) owed Mario money for three kilograms of cocaine, that Mario was a "very serious" person (a good cocaine customer), and that Mario would not give him trouble like Gonzalez did. Rios, Cervante, and Mario met again a few days later, at which time Mario asked Rios for cocaine. Rios replied that he still did not have any, but would contact Cervante when he obtained some.

In June 1989, Rios obtained seven kilograms of cocaine and notified Cervante, as well as his other drug customers. Before Cervante arrived, however, Rios had sold all of the cocaine to his other customers. Rios testified that when he told Cervante upon his arrival that he was too late, Cervante responded, "The next time you have some cocaine call me and give me some time and wait for me." Rios further testified that he met regularly with Cervante throughout 1989, and that Cervante expressed a continued interest in doing a cocaine deal, although Rios' efforts to obtain cocaine during this period were futile. In late December, Rios obtained some heroin. He testified that he left a sample of the heroin under the door of Cervante's store, but Cervante returned it as "no good." [1]

In January 1990, Rios obtained 50 kilograms of cocaine from a Columbian source. He told Cervante about the score and that he was looking for drivers to move the cocaine from Houston to Chicago. Cervante later contacted Rios and told him he had people available to do the trip, but at a higher fee than Rios had quoted him. Rios made other arrangements. Cervante told Rios to let him know when he had "something." Rios testified that he understood Cervante's request to mean that he should contact him when he had the cocaine.

The FBI apprehended Rios approximately two months later, in March 1990, upon his return to Chicago from Houston. After FBI agents confronted him with information about his drug activities, Rios agreed to act as a confidential informant and to tape record conversations between himself and his drug dealing cohorts.[2] Rios reported the substance of an unrecorded mid-March conversation to an FBI agent on the investigation. According to Rios, Cervante initiated the meeting by phoning Rios' beeper and leaving a number where he could be reached. Rios returned Cervante's beep and they met at a restaurant. Solarte was also present. Cervante told them that he had had 500 pounds of mari-

1. On cross-examination, Cervante's attorney questioned Rios as to how he managed to slip the heroin sample under the door of Cervante's shop when it was surrounded by a locked fence. Rios then testified that he did not slip it under the door, as he stated on direct, but that he tossed it through the gate and it landed on the shop's doorstep.

2. Although Rios began cooperating with the government in March 1990, he did not enter into a formal agreement with the government until September 1990. Pursuant to that agreement, the government relocated Rios and his family, paid certain living expenses, and agreed not to prosecute him for his prior drug activities if he told the truth.

juana for sale, but only 100 pounds were left. Cervante gave Rios a sample of the marijuana.

Rios called Cervante on April 12, 1990. This conversation was the first of seven recorded conversations which ultimately led to the cocaine sale and Cervante's arrest.[3] During these conversations, Cervante repeatedly told Rios that he was "waiting for him" to obtain cocaine, and Rios made assurances that he would contact him when he acquired some. They also discussed the amount of cocaine Cervante would purchase and its price. On April 19, Rios telephoned Cervante and told him he had the cocaine. The two men agreed that Rios would deliver the cocaine to Cervante in a specified Brown's Chicken parking lot in Chicago. When Rios arrived at the parking lot at the appointed time later that day, Cervante asked about the quality and quantity of the cocaine, told Rios that he needed three hours to get the money, picked up the duffle bag containing the cocaine, and left Rios' car—at which point federal agents immediately arrested him.

At trial, Cervante took the stand and claimed that he was entrapped.[4] His trial testimony differed significantly from the account given by Rios. Cervante claimed that Rios coaxed him into a cocaine transaction by calling him and suggesting that he take 10 kilograms of cocaine from him and by playing on his emotions. According to Cervante, he had repeatedly discussed with Rios financial problems arising from Cervante's divorce and failing business.[5] He further testified that in February 1990, Rios met him at a restaurant and told him that his (Rios') life was in danger. Cervante stated that Rios was crying and showing him newspaper clippings about the murder of a family—allegedly Rios'—apparently killed as the result of a drug deal gone sour, and that Rios also told Cervante that he owed a dangerous Columbian drug source $1 million. At this meeting, Rios allegedly pleaded with Cervante for help and told him that he wanted to get out of the cocaine business and go into a legitimate business with him.[6] Finally, Cervante testified that Rios offered to put $5,000 into Cervante's failing business if he would help Rios distribute cocaine in an effort to pay back the individuals Rios feared would kill him. According to Cervante, his dire financial status coupled with Rios' "tale of woe" persuaded him to help Rios distribute cocaine.

Whether Cervante was entrapped is a question of fact for the jury. *United States v. Blackman,* 950 F.2d 420, 422 (7th Cir.1991). Here, Cervante contends that the government presented insufficient evidence to support the jury's rejection of his entrapment defense. He bears a heavy burden on appeal, as he must demonstrate that no rational trier of fact could decide beyond a reasonable doubt that he was not entrapped. *Id.* at 422–23. In determining whether sufficient evidence existed, we view the evidence in the light most favorable to the government. *Id.* at 423.

The elements of the entrapment defense are well established. Cervante must demonstrate both that the government induced him to commit the crime and that he lacked the predisposition to engage in the criminal conduct. *Id.* Once a defendant has established both, the burden shifts to the government, which need only establish beyond a reasonable doubt either that the defendant was predisposed to commit the crime or that it did not provoke the defendant into committing the crime. *Id.* The entrapment analysis ends without inquiry into government inducement if the defendant was predisposed to commit the charged conduct. *Id.* A predisposed individual is one who is prepared and eager for

3. Rios did not initiate all of these conversations.

4. The court gave the jury an entrapment instruction.

5. On cross-examination, Rios testified that he discussed Cervante's divorce with him only three times throughout their relationship.

6. On cross-examination, Rios testified that he never cried to Cervante about the security of his family.

the opportunity to commit a crime. *United States v. Evans,* 924 F.2d 714, 717 (7th Cir.1991). The court uses five factors to determine predisposition:

> (1) the character or reputation of the defendant; (2) whether the suggestion of criminal activity was made by the government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government.

*Blackman,* 950 F.2d at 423 (citation omitted).

Focusing on these factors, Cervante points out that he was a community businessman and board member of the local chamber of commerce with no criminal record; that Rios suggested the criminal activity, telephoning him and proposing that he take 10 kilograms of cocaine; that he did not enter into the transaction to "get rich, buy jewels, homes, or cars, but rather to save his modest west-side electronics shop"; and that Rios induced him into the transaction by offering to help him financially and by spinning a "tale of woe that only the most heartless could turn his back on." Appellant's Br. at 19. We find these contentions unpersuasive. Sufficient evidence existed at trial from which the jury could conclude beyond a reasonable doubt that Cervante was predisposed to participate in the drug transaction.

Initially, Cervante's lack of a criminal record is not a crucial factor in determining his predisposition in light of Rios' testimony concerning Cervante's previous involvement with drugs (the money owed to Mario for three kilograms of cocaine, the 500 pounds of marijuana, and the heroin). *See United States v. Beverly,* 913 F.2d 337, 355 (7th Cir.1990) (although defendant had no prior record, evidence of her character and reputation was inconclusive in light of admission that she obtained drugs on a previous occasion). Also, the transcripts of the recorded telephone conversations demonstrate Cervante's ease in communicating in code or drug dealing jargon. *See United States v. Rivera-Espinoza,* 905 F.2d 156, 158 (7th Cir.1990) (defendant's use of drug business terms of art evidenced his knowledge of the drug trade). Cervante argues that his showing up to buy three kilograms of cocaine with no money exemplifies his naivete in the drug world. However, Rios testified that he (Rios) regularly fronted cocaine to customers. Indeed, the record reveals that Cervante, on more than one occasion, assured Rios that he could trust him.

As to the second factor, contrary to Cervante's contention, it was Cervante who made the initial contact when, in 1988, he asked Rios if he had any "merchandise" (cocaine). This led to a relationship in which Rios attempted to acquire cocaine for Cervante. Although Rios initiated the first of the recorded contacts which ultimately led to Cervante's arrest, this puts Cervante in no better position because "mere solicitation by itself by a government agent is not sufficient to establish the entrapment defense." *Blackman,* 950 F.2d at 424 (quoting *United States v. Perez-Leon,* 757 F.2d 866, 872 (7th Cir.1985)).

In regard to profit, while there is no evidence that Cervante entered into the transaction to buy jewelry or fancy cars, he testified that he intended to put the money into his failing electronics business. This court previously has rejected the entrapment defense where profit was not explicitly mentioned, under the assumption that an "individual who operates in a chain of cocaine distribution does not do so at a loss." *Rivera-Espinoza,* 905 F.2d at 158.

The fourth and most important factor in determining predisposition is whether Cervante was reluctant to participate in the drug transaction. *See Beverly,* 913 F.2d at 356. Rios' testimony concerning his contacts with Cervante before he began cooperating with the government demonstrates that Cervante was willing and eager to participate in a drug transaction, and the transcripts of the recorded conversations exhibit Cervante's continued willingness to participate. With the exception of Cervante's own testimony, the record is devoid of any evidence suggesting that Cervante

was reluctant to receive and distribute cocaine. The jury was free to reject Cervante's testimony. *United States v. Jones,* 950 F.2d 1309, 1315 (7th Cir.1991). Cervante's uncertainty as to how many kilograms he could successfully distribute does not amount to reluctance to enter into the transaction. *Cf. United States v. Franco,* 909 F.2d 1042, 1045 (7th Cir.1990) (defendant's inability to sell larger amounts of cocaine did not demonstrate reluctance).

Finally, although Cervante maintains that Rios cajoled him into participating in the cocaine transaction by offering to help him rejuvenate his failing business and playing on his sympathies, Rios' testimony at trial gave a different account. The jury was entitled to credit Rios' version of the events. *Jones,* 950 F.2d at 1315. We will not disturb the jury's credibility determinations unless it credits exceedingly improbable testimony. *Id.; see United States v. Cardona-Rivera,* 904 F.2d 1149, 1152–53 (7th Cir.1990) (listing cases). The fact that Angel Rios was not an angel does not render his testimony incredible as a matter of law. *United States v. Grandinetti,* 891 F.2d 1302, 1307 (7th Cir.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1534, 108 L.Ed.2d 773 (1990) (reversal of government's case not required even when it includes testimony by a gallery of rogues and fibbers). Nor does the fact that Rios benefitted from his undercover government work render his testimony exceedingly improbable. *Jones,* 950 F.2d at 1315. Finally, reversal is not required because of minor inconsistencies in the witnesses' testimony. *Blackman,* 950 F.2d at 424.[7] Even if we were to credit Cervante's testimony, it still is not enough to overcome the conclusion that he was predisposed to participate in the drug transaction. *See Evans,* 924 F.2d at 718 ("When a person accepts a criminal offer without being offered extraordinary inducements, he demonstrates his predisposition to commit the type of crime involved.").

Cervante has failed to establish that he was entrapped. The government presented sufficient evidence from which the jury could find beyond a reasonable doubt that he was predisposed to commit a drug transaction. Accordingly, Cervante's conviction is AFFIRMED.

7. Cervante only points out one inconsistency in Rios' testimony. *See supra* note 3 and accompanying text.