**UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,**

v.

**Arnold L. HOLLINGSWORTH, Jr. and William A. Pickard, III, Defendants–Appellants, Cross–Appellees.**

Nos. 92–2399, 92–2483, 92–2694, and 92–2695.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1993.

Decided Oct. 29, 1993.

Rehearing En Banc Granted; Decision Vacated Jan. 10, 1994.

See also 787 F.Supp. 155.

Mark D. Stuaan, Asst. U.S. Atty., (briefed and argued), Ice, Miller, Donadio and Ryan, Indianapolis, IN, for U.S.

Bradley L. Williams (argued), Indianapolis, IN, for William A. Pickard, III.

James E. Evans, Jr., Springdale, AR, for Arnold L. Hollingsworth, Jr.

Before POSNER, Chief Judge, and RIPPLE and ROVNER, Circuit Judges.

POSNER, Chief Judge.

The defendants, Pickard and Hollingsworth, were convicted by a jury of money laundering in violation of federal law. 18 U.S.C. § 1956(a)(3); 31 U.S.C. § 5324(3) (1988). (Section 5324(3) has since been revised and renumbered 5324(a)(3).) They were sentenced to 24 and 18 months in prison respectively. The main issue on appeal is whether a reasonable jury could have found beyond a reasonable doubt that the government had not entrapped the defendants into committing their crimes.

Pickard is an orthodontist practicing in Fayetteville, Arkansas. Hollingsworth is a farmer and businessman, also in Arkansas. Although Pickard's dental practice is successful, he has repeatedly tried to augment his income by business ventures, all of which have failed. The last and most disastrous failure began in 1988 when he and Hollingsworth decided to become international financiers—a vocation for which neither had any training, contacts, aptitude, or experience. Pickard formed a Virgin Islands corporation, CIAL (Compagnie d'Investement de Les Antilles Limitee), to conduct international banking. The corporation was financed by capital contributions totaling $400,000. Almost all the money came from Pickard and his family, but Hollingsworth and a Taiwanese investor made small contributions. With this money, the corporation advertised for customers and obtained two foreign banking licenses, one Grenadan. No customers were obtained through advertising or otherwise, and with the enterprise steadily losing money the corporation decided to sell the Grenadan license to raise additional working capital. Pickard placed a classified ad in the May 4, 1990, issue of *USA Today* offering to sell the unused license for $29,950. The ad listed CIAL's phone number and told callers to ask for "Bill."

Enter U.S. customs agent J. Thomas Rothrock, working out of the Indianapolis office of the customs service, who that very day was attending a seminar on money laundering. Rothrock read *USA Today* and his eye lit on Pickard's ad. Knowing that foreign banks are sometimes used for money laundering, Rothrock "assumed that someone who wanted to sell one would possibly be interested in money laundering." So on May 11 he called the phone number listed in the ad. He left a message for "Bill," but no one returned the call. He called again on the seventeenth and this time Pickard returned his call. Using as his *nom de guerre* "Tom Hinch," Rothrock told Pickard that he had money from an organization and wanted to deposit it offshore. Pickard responded that he had a bank for sale, and other vehicles or instruments for achieving "Hinch's" purposes that might be less expensive; and in a later call he described a variety of international financial services, all lawful. Hinch explained that his organization had a lot of cash, that the profit margin generated by the organization's activities was very large, and that the organization wanted to accumulate cash and deposit it somewhere. Pickard pointed out that a cash deposit of less than $10,000 would not have to be reported to federal banking authorities, and hence that a larger sum could be broken up into smaller ones and deposited in different banks; alternatively the whole sum could be deposited outside the United

States. Rothrock expressed interest in the first maneuver. After this conversation, which occurred on May 18, Rothrock opened a formal investigation "to determine the past and present unlawful activities of William Pickard" and his corporation. In a subsequent conversation with Rothrock, Pickard retracted the suggestion that the money might be deposited outside the United States, remarking that that would violate the law. (There is no evidence that he realized that "structuring" a large cash deposit to avoid federal reporting requirements would also violate the law.) He asked "Hinch" for assurance that the cash wasn't from drug sales and that Hinch himself was not a federal agent or informer, and Hinch gave him the requested assurances. In another telephone conversation, this one at the end of May, Pickard asked Hinch whether he wanted Pickard merely to "clean and polish" funds or for "extended services"; Hinch was evasive. In subsequent conversations Pickard turned coy, indicating that he was interested only in a long-term banking relationship.

Matters were at a standstill between August 20, 1990, the date of the last of the conversations in which Pickard expressed his lack of interest in providing spot services, and February 9, 1991, when Rothrock, having obtained $200,000 in sting money from his superiors, called Pickard, told him that he was "getting overwhelmed and I'm gonna be in need of your services," and arranged to meet Pickard in St. Louis ten days later. In this, their first face to face meeting, "Hinch" explained that the source of his cash was the smuggling of guns to South Africa. They agreed that Pickard would travel to a hotel room in Indianapolis where he would be shown $20,000 plus Pickard's fee of $2,405 in cash. The deal was that Pickard would arrange a wire transfer of $20,000 to Hinch's bank account and after the transfer was confirmed would take possession of the cash. The transaction took place on April 3, 1991, and subsequent transactions brought the total transferred in this manner to $200,000. Hollingsworth made one of the trips to Indianapolis, bringing back $30,000 in cash for Pickard in exchange for $405 in fee and expenses—all that Hollingsworth ever realized from the dealings with Hinch, so far as

the record discloses. A further transaction was scheduled for September 13, at which Pickard was to transfer $235,000 for Hinch, but when Pickard showed up he was arrested. Hollingsworth was arrested at the same time back in Arkansas. When arrested Pickard was carrying false-name passports for himself and Hollingsworth issued by the mythical "Dominion of Melchizedek." So far as appears, before becoming involved with Hinch neither Pickard nor Hollingsworth had ever engaged in financial or for that matter any other wrongdoing, the Melchizedekian passports having been obtained after Hinch appeared on the scene. Nor did CIAL ever attract a single customer other than Hinch— who also was the only person who responded to the ad for the Grenadan banking license.

Once a defendant who has pleaded the defense of entrapment makes a colorable case that he was indeed entrapped, the government to convict is required to prove lack of entrapment beyond a reasonable doubt, *Jacobson v. United States*, —— U.S. ——, ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992); and the government concedes that Pickard made a sufficient showing to activate the requirement. (We discuss Hollingsworth's case separately at the end of this opinion.) The burden of proving anything beyond a reasonable doubt is heavy. But we must affirm if a reasonable jury could have found that the government carried it even if we doubt that we would have reached the same conclusion had we been on the jury. *United States v. Kamel*, 965 F.2d 484, 489–90 (7th Cir.1992); *United States v. Jones*, 950 F.2d 1309, 1315 (7th Cir.1991). The fact that the government had no basis other than Rothrock's hunch—which so far as appears was a pure shot in the dark—for believing that Pickard and Hollingsworth had engaged or were engaging in illegal money laundering does not by itself establish entrapment. *United States v. Allibhai*, 939 F.2d 244, 249 (5th Cir.1991); *Kadis v. United States*, 373 F.2d 370, 373 (1st Cir.1967). The government is no more required to establish probable cause, or even a lesser degree of cause such as reasonable suspicion, before launching a sting operation than it is required to establish probable cause or reasonable suspi-

cion in order to employ an undercover agent to worm his way into the confidence of persons suspected (whether or not reasonably) of being criminals in order to obtain evidence of their criminal activity. *United States v. Miller*, 891 F.2d 1265, 1269 (7th Cir.1989); *United States v. Harvey*, 991 F.2d 981, 989–92 (2d Cir.1993); *United States v. Jannotti*, 673 F.2d 578, 608–09 (3d Cir.1982) (en banc); *United States v. Luttrell*, 923 F.2d 764 (9th Cir.1991) (en banc) (per curiam); cf. *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Indeed, a sting operation is merely a theatrically elaborated method of deploying undercover agents in criminal investigations.

■ To defeat a defense of entrapment the government must show either that it did not induce the defendants to commit the crime for which they are being prosecuted or, if it did, still they were predisposed to commit it. *Mathews v. United States*, 485 U.S. 58, 62–63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Jones, supra*, 950 F.2d at 1315; *United States v. Evans*, 924 F.2d 714, 716 (7th Cir.1991). The elements of inducement and predisposition have tended to merge. *Id.* at 716–17, and cases cited there. More precisely, inducement has tended to merge into predisposition, now often described as the principal element of the defense. *Mathews v. United States, supra*, 485 U.S. at 63, 108 S.Ct. at 886; see also *United States v. Russell*, 411 U.S. 423, 433–36, 93 S.Ct. 1637, 1643–45, 36 L.Ed.2d 366 (1973). They started out distinct. The defendant had to show that he would not have committed *this* crime, and the government could rebut by showing that he was predisposed, that is, that he would have committed the same type of crime sooner or later without government intervention. *Sorrells v. United States*, 287 U.S. 435, 458, 53 S.Ct. 210, 218, 77 L.Ed. 413 (1932) (concurring opinion); *United States v. Sherman*, 200 F.2d 880, 882–83 (2d Cir.1952). The distinction became blurred when in later cases the burden was placed on the government to prove both elements, lack of inducement and predisposition. An additional reason for this blurring is that the nature of the inducement is often the key to predisposition. The stronger the inducement, the more difficult it is for the government to prove that the defendant would have committed the crime on a different occasion had the particular inducement not been offered. The direction of inference can be reversed. The more predisposed the defendant was to commit the type of crime in question, the less likely it is that the inducement offered by the government did anything more than alter the timing of the crime.

The sense of these inquiries can be made perspicuous by asking *why* there is a defense of entrapment (always a good question to ask when trying to locate the boundaries of a legal doctrine). The answers offered in the cases are various but convergent. Judge Learned Hand said that it was because of "a spontaneous moral revulsion against using the powers of government to beguile innocent, though ductile, persons into lapses which they might otherwise resist." *United States v. Becker*, 62 F.2d 1007, 1009 (2d Cir.1933). In *Sherman v. United States*, 356 U.S. 369, 376, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958), the Supreme Court spoke of "play[ing] on the weaknesses of an innocent party and beguil[ing] him into committing crimes which he otherwise would not have attempted." An earlier decision by the Supreme Court had called it "unconscionable" "to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it." *Sorrells v. United States, supra*, 287 U.S. at 444, 53 S.Ct. at 214; see also *id.* at 451, 53 S.Ct. at 216. We have said that the doctrine's purpose "is to prevent the police from turning a law-abiding person into a criminal," *United States v. Evans, supra*, 924 F.2d at 717—from corrupting him, *Kadis v. United States*, 373 F.2d 370, 373 (1st Cir. 1967), in other words. "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *Sherman v. United States, supra*, 356 U.S. at 372, 78 S.Ct. at 820. "The power of government is abused and directed to an end for which it was not constituted

when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law." *Id.* at 384, 78 S.Ct. at 826 (concurring opinion). In its most recent decision on entrapment the Supreme Court said that "when the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen *who, if left to his own devices, likely would have never run afoul of the law,* the courts should intervene." *Jacobson v. United States, supra,* —— U.S. at ——, 112 S.Ct. at 1543 (emphasis added).

█ The passage just quoted states as clearly as any what we take to be the animating idea behind the doctrine of entrapment: the federal government shall not use its resources to increase the criminal population by inducing people to commit crimes who otherwise would not do so. The reason that this is a matter of judicial concern rather than of unreviewable prosecutorial discretion is not that the courts want to economize on the costs of running the criminal justice system—the responsibility for the efficient allocation of resources to criminal prosecution is lodged elsewhere in our governmental system—but because the proper use of the criminal law in a liberal society is to regulate potentially harmful conduct for the protection of society, rather than to purify minds and to perfect character. A person who would not commit a crime unless induced to do so by the government is not a threat to society and the criminal law has no proper concern with him, however evil his thoughts or deficient his character. The moral law is different; Eve's plea of entrapment by the serpent was rejected. The criminal law of a secular polity has a more limited domain.

█ A person who will commit a particular type of crime without being induced to do so by government agents—who in other words is predisposed to commit this type of crime although, for want of a suitable opportunity, he would not have committed it when he did had it not been for the government's inducement—*is* a threat to society. The likelihood that he has committed this type of crime sometime in the past or that he will do so sometime in the future is great, and by arranging for him to commit it now, in circum-

stances that enable the government to apprehend and convict him, the government punishes and prevents real crimes at lower cost than would be possible if the circumstances had been allowed to develop without government intervention. *United States v. Evans, supra,* 924 F.2d at 717–18; *United States v. Manzella,* 791 F.2d 1263, 1269 (7th Cir.1986). The type of case just described is one in which the "officers or employees of the Government *merely* afford opportunities or facilities for the commission of the offense," *United States v. Russell, supra,* 411 U.S. at 435, 93 S.Ct. at 1644 (quoting *Sorrells* and *Sherman*) (emphasis added), a tactic permitted because it affects only the timing of the defendant's crime. The crime itself is not "the product of the creative activity of [the government's] own officials." *Sorrells v. United States, supra,* 287 U.S. at 451, 53 S.Ct. at 216.

█ The requisite "predisposition" is usually understood to mean that the defendant was ready and willing to commit the crime that the government has set up before the government set it up. *Jacobson v. United States, supra,* —— U.S. at ——–—— n. 2, 112 S.Ct. at 1540–41 n. 2; *United States v. Cervante,* 958 F.2d 175, 178–79 (7th Cir. 1992); *United States v. Evans, supra,* 924 F.2d at 717. Although *United States v. Ulloa,* 882 F.2d 41, 44 (2d Cir.1989), dropped the "ready," on the ground that predisposition is purely a mental state, it was decided before *Jacobson;* and the Supreme Court's formulation of the doctrine in that case, which we quoted earlier—that it bars the punishment of one who if left to his own devices probably would never have run afoul of the law—shows that willingness, the pure mental state, is not enough; there must also be readiness, in the sense that the defendant was poised, was likely, to engage in criminal activity. A person who had dreams of criminality, as Pickard may have had, but no means of living them would be harmless and must be left alone.

That was the situation in *Jacobson* (decided after the trial in this case but applicable, the government concedes, to it), where the Court held as a matter of law that the defendant had been entrapped. Over a period of

26 months government agents through correspondence with the defendant attempted, eventually successfully, to induce him to purchase in violation of federal law magazines containing photographs of young boys engaged in homosexual activities. There were no extraordinary inducements, the sort of thing that might have tempted irresistibly even a person of law-abiding disposition; nor did Jacobson ever express a reluctance to purchase such materials—rather the contrary, as the dissent emphasized. The length of the period of inducement seems to have reflected nothing more than the desire of overimaginative and underemployed law enforcement agents to play an elaborate game of cat and mouse with him. Nevertheless the Supreme Court held that he had been entrapped. It could find no evidence that Jacobson would have violated the law had it not been for the government's efforts. He was a farmer in Nebraska. He had bought some questionable—but not illegal—magazines from a bookstore in California, which is how the government identified him as a potential violator of the child-pornography laws, but there was no evidence (at least the Court referred to none) that he was on the mailing list of any distributor of unlawful materials or likely to be in the future. So far as appears, had the government left Jacobson alone he would never have committed the crime for which he was convicted, not because he was difficult to persuade to commit it (there is no indication that he even knew at what point photographs of nude boys cross the line that separates lawful expression from child pornography, just as Pickard seems not to have known at what point methods of lawfully securing financial privacy become illegal "structuring") but because his opportunities were so limited. By convicting him the government did not remove a threat to society; it merely increased our already staggeringly large criminal population by one. It turned a harmless man with impure thoughts into a felon.

 In this case it turned two harmless, though weak, foolish, and in Pickard's case at least, greedy, men into felons. There is no evidence that before "Hinch" began his campaign to inveigle them into a money-laundering scheme either Pickard or Hollingsworth had contemplated engaging in such behavior, beyond what little can be inferred from Pickard's evident familiarity with the requirement of reporting large cash deposits and his suspicion of government informers. Pickard and Hollingsworth wanted to become international financiers. No significance can be attached to their obtaining foreign banking licenses; they could not have obtained American licenses—they hadn't the background or the resources or the connections. When the opportunity to become *crooked* international financiers beckoned, they were willing enough, though less willing than Jacobson had been to violate the federal law against purchasing child pornography through the mails—Jacobson never evinced reluctance. A reasonable jury could have found Pickard and Hollingsworth "predisposed" *if* the term refers merely to a psychological state of willingness to break the law. But if the concept of predisposition is to serve the purpose of the doctrine of entrapment, it must mean more—must connote opportunity (what we are calling "readiness") as well as willingness. Only then will it illuminate what the Supreme Court in *Sorrells* called "the controlling question whether the defendant is a person otherwise innocent whom the Government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials." 287 U.S. at 451, 53 S.Ct. at 216. See also *United States v. Becker, supra,* 62 F.2d at 1008–09.

Pickard and Hollingsworth had no prayer of becoming money launderers without the government's aid. Their solicitations for financial business had produced a tiny investor, but no customers. Their corporation was running out of money when they placed the ad in *USA Today* for the Grenadan banking license. No one responded to the ad, except "Hinch." Suppose he hadn't responded. What would Pickard and Hollingsworth have done next? Flashed their passports from the Dominion of Melchizedek? Even if they had wanted to engage in money laundering, they had no way of obtaining customers. You do not advertise that you are a money launderer. You need to know criminals, or at least know people who know criminals. (It is a lot harder to become an inter-

national money launderer than to buy an obscene magazine through the mails.) Whatever it takes to become an international money launderer, there isn't an iota of evidence that Pickard or Hollingsworth had it. Had Hinch not answered the ad, Pickard would soon have folded his financial venture. It would have joined his other failures—his movie theaters that failed, his amusement park that failed, his apartment building that failed, his attempt to market cookbooks written by his wife that failed. By the time he turned with quixotic persistence to international banking he had already lost almost $300,000 in his business ventures. He plunged his remaining life savings and those of his family into CIAL. They were rapidly hemorrhaging when Hinch popped up. Had it not been for that contrived ray of hope Pickard would have been forced to abandon international financing in order to avoid financial ruin. He was a threat to himself and his family. He was never a threat to society. All this is even clearer with respect to Hollingsworth, who functioned in CIAL purely as a minor investor and factotum.

It would be different if CIAL had had an up-and-running bank, for then it would have had a realistic opportunity to engage in money laundering, in much the same way that a public official to whom a government undercover agent or informant might offer a bribe would have a real opportunity to sell his office, as in *United States v. Jenrette*, 744 F.2d 817, 822 (D.C.Cir.1984). Pickard and Hollingsworth didn't have a bank or a public office or any other facility that made it even remotely likely that they would have engaged in criminal activity if the government had not set their minds to it.

■ We do not wish to be understood as holding that lack of *present* means to commit a crime is alone enough to establish entrapment if the government supplies the means. Suppose that before Hinch chanced on the scene (for *Jacobson* makes clear that a predisposition *created* by the government cannot be used to defeat a defense of entrapment), Pickard had decided to smuggle arms to Cuba but didn't know where to buy a suitable boat. On a hunch, a government agent sidles up to Pickard and gives him the address of a boat dealer; and Pickard is arrested after taking possession of the boat and setting sail, and is charged with attempted smuggling. That would be a case in which the defendant had the idea for the crime all worked out and lacked merely the present means; and if the government had not supplied them someone else very well might have. Our case is different. Our two would-be international financiers were at the end of their tether, making it highly unlikely that if Hinch had not providentially appeared someone else would have guided them into money laundering. No real criminal would do business with such tyros. Or so it appears; for the government could have tried to present evidence that Pickard and Hollingsworth were predisposed in the sense of being not only willing but at least potentially, plausibly, conceivably, able to commit the crime without prodding by the government here protracted over a period of many months. It might have presented evidence that a Grenadan banking license has no other use but money laundering and that sooner or later Pickard and Hollingsworth would have gotten into money laundering even without the government's aid. No such evidence was presented.

■ The emphasis that our analysis places on a defendant's ability or opportunity or what we are calling readiness to commit the crime without the government's assistance may seem new, but it is implicit in the authoritative formulations of the doctrine of entrapment and compelled by the doctrine's function, in a liberal society, of confining criminal law to the prevention of dangerous activities. It is true that Pickard and Hollingsworth did not merely dream; they also acted. But they would not have acted had the government not persuaded them to act. The government manufactured a crime; it turned bad thoughts into bad acts. Perhaps the hair-trigger reactions of agent Rothrock to the remotest sign of possible money laundering will, if this conviction is upheld, send tremors through the money-laundering community, though probably his abilities could have been put to better use elsewhere, in the investigation of real money launderers—who could not interpose a plausible defense of entrapment. That is none of our business.

We recognize the separation of powers. The doctrine of entrapment protects the privacy of the citizen rather than economy in law enforcement. The case is well within the scope of the doctrine, if purpose determines scope, and is unusual only because the government rarely initiates a sting operation without a strong suspicion that the targets are engaged in criminal activity; and when they are, their ability to engage in the crime that the government has set up cannot be questioned. Our decision has no implications at all for the garden-variety drug cases in which the defense of entrapment is most frequently, but futilely, raised. One who sells drugs to or buys drugs from a government informant or undercover agent has by that very act demonstrated his ability to commit the crime. *United States v. Dion*, 762 F.2d 674, 687–88 (8th Cir.1985), rev'd on other grounds, 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986).

We have spoken mainly so far of Pickard. Hollingsworth, without quite saying that he himself was entrapped, argues that it would be "fundamentally unfair" to convict him if Pickard's defense of entrapment succeeds. The government's brief construes this as an argument for entrapment and responds that Hollingsworth was entrapped not by Rothrock but by Pickard and that private entrapment doesn't count. If Hollingsworth waived entrapment by putting all his eggs in the "fundamental fairness" basket—and maybe he did waive it, *United States v. Bradley*, 820 F.2d 3, 7 n. 5 (1st Cir.1987)—the government bailed him out by waiving waiver. *United States v. Caputo*, 978 F.2d 972, 975 (7th Cir.1992). So we proceed to the merits.

There is of course no defense of private entrapment. *United States v. Jones*, *supra*, 950 F.2d at 1315; *United States v. Manzella*, *supra*, 791 F.2d at 1269. A person hired to commit a crime cannot defend on the ground that the hirer offered him so much for the crime that it broke down his resistance. Such a plea is actually an argument for a heavier sentence for such a crime, in order to offset the inducement. The severe punishments for violation of the drug laws may reflect the profitability of drug trafficking: the more profitable a crime, the more costly must the punishment be to the criminal in order to deter him from committing it. But Pickard did not induce Hollingsworth to commit a real crime. He transmitted Rothrock's inducement to commit a phony crime. Relative to Hollingsworth he was Rothrock's agent, albeit an unwitting one; and it is settled that the defense of entrapment will lie even though the entrapper was a government informant rather than a government employee. *Sherman v. United States, supra*, 356 U.S. at 373–74, 78 S.Ct. at 821–22. To acquit Pickard but convict Hollingsworth would produce the absurdity of acquitting the principal while sending the agent to prison for 18 months even though the principal had rendered no assistance to the government, the agent did not have a longer criminal record (no evidence was presented at trial that either defendant had had any previous scrapes with the law), and no other circumstance authorizing heavier punishment of the lesser criminal was present either.

In *Manzella* we left open the question whether there is a doctrine of vicarious entrapment. 791 F.2d at 1269–70. When *Manzella* came down, the Second Circuit had held that there was such a doctrine. *United States v. Valencia*, 645 F.2d 1158, 1168–69 (2d Cir.1980). Since then, the First Circuit has held that there isn't, *United States v. Bradley, supra*, 820 F.2d at 6, and the Second Circuit has retrenched, *United States v. Pilarinos*, 864 F.2d 253, 256 (2d Cir.1988)—though how far is unclear, since the defendant in *Pilarinos* was predisposed and therefore not entitled to invoke the defense however expansively it should be defined. Our subsequent decision in *United States v. Marren*, 890 F.2d 924, 931 n. 2 (7th Cir.1989), while suggesting in dictum that there is no doctrine of vicarious entrapment, held that if there were one it would be inapplicable to a defendant himself predisposed, as was the defendant in that case; and of course we agree. But Hollingsworth was no more predisposed than Pickard. Like Pickard he was willing enough, but he was even less likely than Pickard to be able to commit the crime of money laundering without the government's assistance. If entrapment is "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely

would have never run afoul of the law," *Jacobson v. United States, supra,* —— U.S. at ——, 112 S.Ct. at 1543, Hollingsworth was as much entrapped as Pickard, and possibly more so. And entrapped *by the government.* As we said earlier, there is no defense of private entrapment. But when a private individual acts as agent or conduit for governmental efforts at entrapment, the government as principal is bound.

The concern with recognizing a defense of vicarious entrapment is that it would enormously complicate the trial of criminal cases. In any case in which a government undercover agent or informant had been used, defendants with whom he had not dealt face to face or even over the phone could argue with more or less plausibility that the real criminals with whom they had dealt had merely been transmitting the inducements furnished by the agent or informant. But we need not decide in this case how closely the defense should be confined. Rothrock dealt directly with Hollingsworth as well as with Pickard. They were a threesome. If Pickard was entrapped, so was Hollingsworth, even if on some occasions Rothrock was as it were speaking to Hollingsworth through Pickard.

At sentencing some facts emerged about Pickard's and Hollingsworth's previous activities that suggest a greater readiness to commit financial crimes than the trial record discloses. And at the oral argument of the appeal the government's lawyer complained that some evidence which might have rebutted the defense of entrapment was excluded from the trial, although his brief made no such complaint. But the defendants cannot be convicted on the basis of evidence presented after they were tried.

The judgment of the district court is reversed with directions to acquit both defendants, and the government's cross-appeal, which attacks the defendants' sentences as too lenient, is dismissed as moot.

REVERSED.

RIPPLE, Circuit Judge, dissenting.

Today, the majority of this panel alters in two major respects the law of entrapment. It does not do so by an incremental shift in perspective or by articulating a slight nuance to established doctrine. It forthrightly adds a distinct burden for the government to carry and, with respect to private entrapment, recognizes a doctrine not accepted in our circuit or, for that matter, in almost any circuit. I believe that the court has departed radically from the established law of this circuit, and more importantly from the governing precedent of the Supreme Court of the United States. I also believe that the burden that this new approach will impose on legitimate law enforcement efforts will be substantial. Accordingly, I respectfully dissent.

At the beginning, it is important to recall that the law of entrapment is not an area of significant ambiguity. Over the last several decades, the Supreme Court has expended a great deal of judicial energy in formulating the governing principles. As this circuit noted in *United States v. Fusko,* 869 F.2d 1048 (7th Cir.1989):

> The basic law governing the affirmative defense of entrapment is well established. In *Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), the Supreme Court noted that it had "consistently adhered to the view ... that a valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." 485 U.S. at 62–63, 108 S.Ct. at 886.

*Id.* at 1051.

The underlying policy concern that animates the doctrine has also been clear. As the present Chief Justice noted in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973):

> It is rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been "over-zealous law enforcement," but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the Government.

*Id.* at 435, 93 S.Ct. at 1644.

### I. "READINESS"

#### 1.

Today's decision introduces a new and independent hurdle for the government to sur-

mount. No longer is it enough for the government to establish that the defendant was predisposed to commit the crime; it must now also establish his "readiness" to do so. The introduction of this admittedly new element into the entrapment doctrine alters both the doctrine and the policy concerns that have animated that doctrine.

In *Russell,* Justice Rehnquist explained that, from the Court's first recognition of the entrapment doctrine in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), "the thrust of the entrapment defense was held to focus on the intent or predisposition of the defendant to commit the crime." *Russell,* 411 U.S. at 429, 93 S.Ct. at 1641 (emphasis added). "Predisposition, 'the principal element in the defense of entrapment,' *Russell,* [411 U.S.] at 433 [93 S.Ct. at 1643], focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (emphasis added) (quoting *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958); *Russell,* 411 U.S. at 436, 93 S.Ct. at 1645). That determination is based upon the intent of the defendant. A defendant is protected by that defense "[i]f the result of the governmental activity is to 'implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission.'" *Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (quoting *Sorrells,* 287 U.S. at 442, 53 S.Ct. at 212–13). Because predisposition concerns the defendant's state of mind at the time of the government inducement, it is usually an issue of fact for the trier of fact to decide. *Mathews,* 485 U.S. at 63, 108 S.Ct. at 886.[1]

The "readiness" of the defendant has an established role in the determination of whether a defendant is predisposed to commit an offense. It is circumstantial evidence that is relevant and probative evidence of whether the defendant was in fact predisposed to commit the offense. Indeed, the classic formulation of the predisposition factor, in the opinion of Judge Learned Hand in *United States v. Sherman,* 200 F.2d 880 (2d Cir.1952), treats the "ready and willing" conception in this manner,[2] and the caselaw of the circuits has treated the concept in this way consistently. Predisposition may thus be established by evidence of the defendant's readiness or willingness to commit the offense. *Sherman,* 200 F.2d at 882. *See, e.g., United States v. Mendoza–Salgado,* 964 F.2d 993, 1002 (10th Cir.1992); *United States v. Ventura,* 936 F.2d 1228, 1230–31 (11th Cir. 1991); *United States v. Alston,* 895 F.2d 1362, 1368 (11th Cir.1990); *United States v. Carrasco,* 887 F.2d 794, 814 (7th Cir.1989); *United States v. Shukitis,* 877 F.2d 1322, 1331 (7th Cir.1989); *United States v. Fusko,* 869 F.2d at 1052; *United States v. Perez–Leon,* 757 F.2d 866, 871 (7th Cir.), *cert. denied,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985). *See also, e.g., United States v. Hudson,* 982 F.2d 160, 162 (5th Cir.1993) (holding defendant's enthusiasm for crime can satisfy predisposition requirement), *cert. denied,* —— U.S. ——, 114 S.Ct. 100, 126 L.Ed.2d 67 (1993).

In similar fashion, the alacrity with which the defendant accepts the invitation is circumstantial evidence of his predisposition to commit the illegal act. Recently, the Supreme Court has reminded us that predispo-

---

1. Entrapment exists as a matter of law in two situations: when the factual evidence of entrapment is undisputed, *see, e.g., United States v. Martinez,* 979 F.2d 1424, 1429 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993); *United States v. Haddad,* 976 F.2d 1088, 1095 (7th Cir.1992); and when the evidence is insufficient to submit the issue to the jury. *See, e.g., United States v. Ortiz,* 804 F.2d 1161, 1164 (10th Cir.1986); *United States v. Jannotti,* 673 F.2d 578, 597 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Tritton,* 535 F.2d 359,

360–61 (7th Cir.1976). *See generally* Paul Marcus, *The Entrapment Defense* § 4.10 at 136 (1989).

2. Although Judge Hand is credited with creation of the phrase "ready and willing," this court and the Tenth Circuit used it in entrapment decisions prior to Judge Hand's ruling in *United States v. Sherman. See Ryles v. United States,* 183 F.2d 944, 945 (10th Cir.), *cert. denied,* 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 637 (1950); *United States v. Markham,* 191 F.2d 936, 938 (7th Cir.1951).

sition is demonstrated by the defendant's "ready commission of [a] criminal act." *Jacobson v. United States,* — U.S. —, —, 112 S.Ct. 1535, 1541, 118 L.Ed.2d 174 (1992) (emphasis added) (citing *Sherman,* 200 F.2d at 882). *See also United States v. Kussmaul,* 987 F.2d 345, 349 (6th Cir.1993); *United States v. Tejeda,* 974 F.2d 210, 217–18 (1st Cir.1992). Predisposition can also be proven by a showing of the defendant's ready response to the inducement being offered. *Jacobson,* — U.S. at —, 112 S.Ct. at 1543; *United States v. Jones,* 976 F.2d 176, 179 (4th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993); *United States v. Dozal–Bencomo,* 952 F.2d 1246, 1251 (10th Cir.1991); *United States v. Sullivan,* 919 F.2d 1403, 1418 (10th Cir.1990). In this sense, the defendant's preparation for the opportunity is no doubt relevant and probative on the issue of his predisposition. *See generally* Paul Marcus, *The Entrapment Defense,* § 4.16 at 150 (1989). It is not, however, an independent element of the defense.[3]

By this decision, the majority treats "ready" as a new word of art that radically changes entrapment law.[4] The panel majority has changed the "ready" defendant from one who is inclined, feeling or exhibiting no reluctance, to one on the point of acting. This massive alteration in the settled caselaw places this circuit at odds with the controlling caselaw of the Supreme Court and with the settled precedent in the other circuits. For example, the approach taken by the panel majority cannot live in peace with the holding of the United States Court of Appeals for the Second Circuit in *United States v. Ulloa,* 882 F.2d 41 (2d Cir.1989). In *Ulloa,* the trial court instructed that the government was required to prove that the defendant "was predisposed, or 'ready and willing,' to commit the crime before the informant's inducement." *Id.* at 43.[5] Several times the jurors sent notes to the judge, asking him to explain what "ready" means. The judge stated: "'Ready' implies an open amenability to it. It is not terribly different from 'willing.' The two of them together imply a certain amenability to be involved in illegal conduct." *Id.* at 44. The defendant appealed the court's interpretation, which equated "readiness" and "willingness." He asserted that the government was required to prove that the defendant *was not only willing but also ready to commit the crime, in the sense of having*

---

3. The Eighth Circuit gave a more detailed list of factors to be viewed in determining disposition. It included:

whether the defendant readily responded to the inducement;

the circumstances surrounding the illegal conduct;

the defendant's state of mind before the government's inducement;

whether the defendant was engaged in an existing course of conduct similar to the crime for which he is charged;

whether he had already formed the "design" to commit the crime for which he is charged;

the defendant's reputation;

the conduct of the defendant during negotiations with the undercover agent;

whether the defendant refused to commit similar acts on other occasions;

the nature of the crime charged;

the degree of coercion present in the instigation, relative to the defendant's criminal background.

*United States v. Dion,* 762 F.2d 674, 687–88 (8th Cir.1985) (compilation from quotation), *rev'd on other grounds,* 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986).

4. Perhaps the majority means that the government must prove a defendant's "readiness" to commit the crime when he is a first-time offender, when there is no previous criminal record to which the government can point for evidence of prior disposition. For it is clear that a defendant's prior arrests and convictions, his previous associations with drug traffickers, are strong indications of predisposition. Without that past record, however, would a defendant's quick reply to an agent's invitation to "talk business" count as predisposition? Would his agreement to distribute drugs show a willingness only, or also a readiness? *See United States v. Olson,* 978 F.2d 1472, 1483 (7th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993).

5. The majority's attempt to distinguish *United States v. Ulloa,* 882 F.2d 41 (2d Cir.1989), on the ground that it antedates *Jacobson v. United States,* — U.S. —, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), belies its attempt elsewhere in the opinion to reassure that, while the new test may seem new, it had been implicit in the traditional approach. In short, the panel majority, notwithstanding its protestations, takes the position that *Jacobson* altered established law, a position certainly never acknowledged by the Supreme Court nor, to our knowledge, by any court of appeals.

*the present physical ability to do so.* The Second Circuit rejected this argument:

> The focus of the entrapment inquiry, once inducement by the Government is established, is on the defendant's state of mind. [In our cases stating that the defendant was "fully prepared" to act,] we noted the defendant's physical readiness in order to demonstrate why the entrapment defense failed as a matter of law. *We did not say that the Government was required to prove readiness in this sense to sustain its burden in proving disposition.*

*Id.* (emphasis added).

In short, the panel majority has created a new and unrealistic burden. That burden places beyond the reach of our criminal law activity what every other court in the country considers to be within the permissible ambit of criminal proscription. The panel majority makes no serious attempt to demonstrate that its new barrier is compatible with the intent of the Congress in enacting the criminal code. Nor does it attempt to explain why a person who fully desires to break the law and is entirely willing to do what needs to be done to accomplish a criminal objective ought be excused from criminal liability simply because, for whatever reason, he does not have his act together when afforded an opportunity by the undercover agent.

**6.** In this case, the majority's entrapment analysis focuses on the defendant's lack of predisposition to commit the charged conduct; for that reason there is no need for an inquiry into the government's inducement. *See United States v. Cervante,* 958 F.2d 175, 178 (7th Cir.1992). However, it should be noted that, in the face of a paucity of actual evidence of inducement, the majority presents considerable "innuendo evidence" of the government's coercion. It suggests that the agent's belief that Mr. Pickard might be engaged in illegal money laundering, based solely upon Mr. Pickard's ad in *USA Today,* was a "hunch," a "pure shot in the dark." Maj. op. at 597. Even though it acknowledges that the government need not establish probable cause to initiate a sting operation intended to afford an opportunity for Mr. Pickard to commit an offense, it describes the agent's actions as "worm[ing] his way into the confidence of persons suspected (whether or not reasonably) of being criminals in order to obtain evidence of their criminal activity." Maj. op. at 597.

The evidence of inducement is scanty or nonexistent in this case. Certainly the agent's phone

**2.**

The transformation in the law of entrapment worked by the panel majority is not simply a theoretical doctrinal change. It is an alteration with significant practical ramifications. The majority opinion evidences a great deal of sympathy for the defendant who is not up to the task of sophisticated criminality or, for that matter, anything sophisticated. Until now, the government had the obligation to establish that the defendant committed the elements of the offense without having been provided an inducement by the government [6] and without having had the idea of criminality implanted by the government. Now the government must also demonstrate that the defendant has sufficient aptitude to commit the crime and thus poses an immediate danger to society.

The panel takes this significant step in a case that does not pose the typical situation facing the modern federal prosecutor. The holding in this case, however, will benefit not only the sympathetic incompetents of the criminal world but also the very competent criminal who is sufficiently studied in his way of doing business so as to appear not *too* organized. This holding adds a whole new dimension to the arsenal of the mainstream drug trafficker and the traditional racketeer.

calls to Mr. Pickard and his use of a *nom de guerre,* as the majority describes his pseudonym, are not inducements. Maj. op. at 597. In their first conversation the agent described lots of cash that he wanted to deposit, but Mr. Pickard was the one to suggest that sums larger than $10,000 could be broken up into smaller amounts to avoid the federal banking reporting requirements. In subsequent conversations, it was again Mr. Pickard who initiated questions concerning illegalities: He informed the agent that foreign deposits would violate the law, asked for assurance that the money was not drug-related and that the agent was not an agent, and inquired whether the agent wanted to "clean and polish" funds or to receive "extended services." *Id.* at 595. Then nothing happened for more than five months; the agent was not persistent. When the "sting" occurred, the agent told Pickard that the money to be invested came from smuggling guns to South Africa. The fee offered, $2,405 for Mr. Pickard at that time, $405 for Mr. Hollingsworth in a later transaction, was certainly not a strong inducement. It seems clear that the agent offered Pickard (and Hollingsworth) an opportunity to launder money and they took it.

It will provide first rate arrest insurance for the occasional drug trafficker [7] who, willing to ply his trade whenever the opportunity presents itself, is still not quite sufficiently organized when the opportunity is provided by the undercover agent. Defendants' claims that they were stupid or duped are not new to this court. *See, e.g., United States v. Neely,* 980 F.2d 1074, 1085–86 (7th Cir.1992) (finding no impropriety in prosecutor's statement that defendants tried to "dupe" hospital staff); *United States v. Johnson,* 927 F.2d 999, 1004–05 (7th Cir. 1991) (rejecting defendant's claim that she was too unsophisticated to have requisite intent to defraud government); *United States v. George,* 869 F.2d 333, 334 (7th Cir.1989) (noting defendant's claim at sentencing hearing that court consider defendant's totally unsophisticated behavior).[8] *See also Dozal–Bencomo,* 952 F.2d at 1251 (stating defendant "not the unwilling dupe he would have us believe").

There is, of course, no constitutional requirement that the Congress punish only activity that is *immediately* dangerous. Nor do I know of any expression of such an intent by the Congress. If such a criterion is appropriate for what the panel majority terms a "liberal" society, it is the members of Congress, not the judges of an intermediate appellate court, who ought to make that decision. *Russell* emphatically settles this question of our authority. 411 U.S. at 435, 93 S.Ct. at 1644. It must govern our decision today.

**7.** Although the panel majority suggests that its new test would not hamper legitimate government law enforcement efforts in this regard, it noticeably limits its assertion to those cases in which a sale actually is consummated. Even in that situation, it leaves ambiguous the application of its new test when the occasional trafficker, although not "ready" when first approached by the government agent, takes additional steps to cure that deficiency before the actual consummation of the sale. Initial reluctance in a drug "buy" is not an atypical behavior pattern.

**8.** Occasionally a truly unsophisticated defendant successfully pleads the entrapment defense. *See Dion,* 762 F.2d at 685–90.

**9.** The cases holding that there is no defense of private entrapment include *United States v. Mahkimetas,* 991 F.2d 379, 386 (7th Cir.1993); *United States v. Neal,* 990 F.2d 355, 358 (8th Cir. 1993); *United States v. Jones,* 950 F.2d 1309,

## II. PRIVATE/VICARIOUS ENTRAPMENT

The majority of the panel also holds that Mr. Hollingsworth is, as a matter of law, protected from criminal liability by the defense of "vicarious entrapment." Here also, this decision charts a different course from almost all of the circuits and deviates from the course previously set by our decisions.[9] This circuit, along with every other circuit, except the Second, has steadfastly held that there is no defense of private entrapment. *See United States v. Mahkimetas,* 991 F.2d 379, 386 (7th Cir.1993); *United States v. Jones,* 950 F.2d 1309, 1315 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1700, 118 L.Ed.2d 410 (1992); *United States v. Manzella,* 791 F.2d 1263, 1269 (7th Cir.1986). Even the Second Circuit's decision in *United States v. Valencia,* 645 F.2d 1158, 1168–69 & n. 10 (2d Cir.1980), has been placed in doubt by the subsequent caselaw of that circuit. *See United States v. Pilarinos,* 864 F.2d 253, 256 (2d Cir.1988) (holding no derivative entrapment where middleman induced by agent to commit crime, responding to pressure, takes it upon himself to induce another to participate in crime); *United States v. Toner,* 728 F.2d 115, 126–27 (2d Cir.1984) ("[T]here *is* a burden of showing that the government's inducement was directly communicated to the person seeking an entrapment charge"). So-called derivative or vicarious entrapment, like private entrapment, is not, and ought

1315 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1700, 118 L.Ed.2d 410 (1992); *United States v. Goodacre,* 793 F.2d 1124, 1125 (9th Cir.), *cert. denied,* 479 U.S. 993, 107 S.Ct. 595, 93 L.Ed.2d 595 (1986); *United States v. Manzella,* 791 F.2d 1263, 1269 (7th Cir.1986); *United States v. Leroux,* 738 F.2d 943, 947 (8th Cir.1984) (collecting cases); *United States v. Dove,* 629 F.2d 325, 329 (4th Cir.1980). Cases holding that the defense of vicarious or derivative entrapment is not recognized include *United States v. Martinez,* 979 F.2d 1424, 1432 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993) (collecting cases); *United States v. Buishas,* 791 F.2d 1310, 1313 (7th Cir. 1986); *Leroux,* 738 F.2d at 947; *United States v. Mers,* 701 F.2d 1321, 1340 (11th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983).

not, be recognized as a defense. *United States v. Marren*, 890 F.2d 924, 931 n. 2 (7th Cir.1989); *United States v. Buishas*, 791 F.2d 1310, 1314 (7th Cir.1986). "Without *direct government communication* with the defendant, there is no basis for an entrapment defense." [10] *United States v. Martinez*, 979 F.2d 1424, 1432 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993). Entrapment ought to succeed as a defense only if the government "implant[s] in the mind of an innocent person the disposition to commit the alleged offense and induce its commission." *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (quoting *Sorrells*, 287 U.S. at 442, 53 S.Ct. at 212–13). Either the government agent or official induced the defendant or he did not; a "minimal conception of vicarious entrapment" simply serves none of the policy concerns that justify the burden placed on the government by the defense of entrapment.

**10.** The First Circuit has suggested, albeit in *dicta,* that there may be circumstances when communication with the defendant through an intermediary at the instruction of a government agent would be sufficient. *United States v. Hernandez,* 995 F.2d 307, 313 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993).